[No. H029936. Sixth Dist. May 24, 2007.]

CHRISTINE ROTOLO et al., Plaintiffs and Appellants, v.
SAN JOSE SPORTS AND ENTERTAINMENT, LLC, et al., Defendants and
Respondents.

COUNSEL

Reed Smith, Paul D. Fogel, Raymond A. Cardozo, Jayne E. Fleming; Hinton, Alfert & Sumner, Peter J. Hinton and Elise R. Sanguinetti for Plaintiffs and Appellants.

Selman Breitman, Paul E. Stephan and Jennifer J. Capabianco for Defendants and Respondents.

OPINION

BAMATTRE-MANOUKIAN, Acting P. J.—

## INTRODUCTION

In this wrongful death action, the parents of a teenager who died as a result of sudden cardiac arrest while participating in an ice hockey game sued the operators of the ice hockey facility. They alleged that defendants had a duty to notify users of the facility of the existence and location of an automatic external defibrillator (AED) at the facility. They claimed that the timely use of such a device would have greatly increased the teenager's chances of survival.

The trial court sustained defendants' demurrer to plaintiffs' third amended complaint. The trial court noted that the Legislature had set forth a detailed statutory scheme concerning the acquisition and use of AED's, which "did not include any requirement to notify business invitees of the existence or location of AED's on a premises." The court further found no common law duty under the facts of this case, beyond a duty to timely summon emergency services, which defendants fulfilled. The court found that plaintiffs could not state a cause of action under the facts as pleaded, and denied leave to amend. Judgment was entered in favor of defendants, and plaintiffs appeal.

On appeal, appellants contend the court erred in finding that respondents did not have a legal duty to develop an emergency plan that included

informing league officials and coaches of onsite defibrillators. They contend that the imposition of such a duty is consistent with the statutes governing the acquisition and use of AED's and is a natural evolution of the common law. The duty of notice is a minimal burden, they argue, considering the weighty consequence that lives could be saved. Appellants' argument is a particularly compelling one in the circumstances of this case, where the lifesaving device was installed nearby throughout the attempted resuscitation of the victim, but no one was aware that it was there and available for use. Our review of the law, however, leads us to the conclusion that the duty appellants seek to impose upon respondents is not supported either by the statutes or by the principles developed in California common law.

First, the Legislature has occupied the field by enacting a number of detailed and comprehensive statutes governing the acquisition and use of AED's. (Civ. Code, § 1714.21; Health & Saf. Code, § 1797.196; Gov. Code, § 8455.) These statutes reflect legislative policy to encourage the availability of AED's by providing immunity from liability for those who acquire the devices, when they are used in an attempt to save a life. As we discuss further below, the Legislature has made clear that building owners and managers have no duty in the first instance to acquire and install an AED. (Health & Saf. Code, § 1797.196, subd. (f).) Those who do install AED's in their buildings will not be liable for damages resulting from the rendering of emergency care with an AED, so long as certain requirements are met, including maintenance, testing, posting and notice. (Health & Saf. Code, § 1797.196, subd. (b)(2)(A), (B), (3) & (4).) The notice that is required is specifically limited to tenants of the building where the AED is located. (Health & Saf. Code, § 1797.196, subd. (b)(3).) The only other notice requirement set forth in these statutes is that the person or entity that supplies an AED must notify the local emergency services agency of its location. (Health & Saf. Code, § 1797.196, subd. (c)(1).) Nothing in these statutes requires that a building owner or manager give notice to particular members of the public expected to use the building. Furthermore, we believe the imposition of such duties that are not clearly outlined in the statutes would tend to discourage, rather than to encourage, the voluntary acquisition of AED's, and would thus defeat the underlying legislative purpose of promoting the widespread use of these devices.

Second, under the common law of this state, the duty of care of a landlord, based on the special relationship to tenants and invitees, has never been extended to impose an affirmative duty such as appellants seek to impose here, to give notice to prospective invitees of the existence and location of a medical device. As we shall explain, a landlord has a duty to maintain the premises in a reasonably safe condition and may have a duty to prevent foreseeable harm, such as a criminal attack by a third party, from occurring to those using the premises, or to take certain steps to come to the aid of an

invitee in the face of imminent or ongoing danger. In regard to the extent of the duty of a landlord or business proprietor to come to the aid of a sick or injured invitee, courts have found that sound policy limits the extent of this duty to promptly summoning emergency services. We have found no precedent in the cases discussing the special relationship of a property owner to those using the property that supports the imposition of a duty to provide advance notice to invitees to the property that certain lifesaving equipment is available.

Appellants contend that operators of sports facilities in particular should be duty bound to take affirmative steps to avoid foreseeable injury to participants using the facilities. As we shall discuss, special rules have developed in the law in this area. In the context of sports facilities, those who choose to participate in the sport assume the primary risk of injury inherent in the sport. As to the owner or manager of the facility, courts have found a limited duty to use due care "not to increase the risks to a participant over and above those inherent in the sport." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 316 [11 Cal.Rptr.2d 2, 834 P.2d 696].) Respondents in this case did nothing to increase the risk of an injury that is inherent in the sport.

Appellants also argue that a duty arises in this case because respondents voluntarily acquired an AED; thus, they were duty bound to make the device available for use in an emergency by invitees using the property. But this theory, which is akin to a doctrine known as the "negligent undertaking" doctrine, does not apply in the circumstances here because the two elements underlying the doctrine are not present: respondents' acquisition of an AED did not increase the risk of harm to those using the facility, and the users of the property did not rely to their detriment on respondents' undertaking. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 249, fn. 28 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*).)

Finally, we have carefully considered the various factors that contribute to the policy decision whether a duty should be imposed in particular circumstances, and what the scope of that duty should be. Appellants emphasize that the duty they seek to impose is a minimal one and would contribute greatly to preventing the harm that occurred here by making it more likely that the AED would be used in an appropriate case. We agree that it would be advisable and helpful for operators of sports facilities to develop an emergency plan that includes notice to users of the facility of the availability of lifesaving devices on the premises. However, it would be a significant departure from settled law to create a legal duty that is nowhere defined in the statutes or in common law, and to impose such a duty on countless owners and managers of sports facilities throughout this state. And the goal of encouraging the acquisition and use of AED's would not necessarily be furthered if those who

have voluntarily acquired the devices were exposed to liability for breaching duties of care beyond those described in the law. If that is to be the policy of this state, we believe it should be articulated by the Legislature or by the California Supreme Court.

For all of these reasons we decline to impose a legal duty where the Legislature has not imposed a duty and where the duty appellants propose is not supported by controlling precedent in the body of common law. Because of the importance of the issues raised by this case, we encourage appellants to seek redress in the Legislature. Our review, however, is limited by doctrines governing our role as an intermediate appellate court. We may not sit as a superlegislature, particularly where our lawmakers have indicated an intent to occupy the field as to the use and regulation of AED's. And, under the principles of stare decisis, we must defer to California Supreme Court authority defining the limits of duty imposed upon landowners or business operators. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) We therefore affirm the judgment.

## BACKGROUND

Appellants are the mother and father of the decedent, Nicholas Rotolo. Respondents are three business entities: San Jose Sports and Entertainment, LLC; Silicon Valley Sports and Entertainment, LLC; and San Jose Arena Management, LLC. Respondents operate and control a facility known as Logitech Ice at San Jose (Logitech Ice), which is an ice hockey facility open to the general public and youth hockey clubs as well as professional teams.

On February 5, 2004, 17-year-old Nicholas Rotolo was participating in a hockey tournament game on the south rink at Logitech Ice. During the game, he experienced sudden cardiac arrest and collapsed on the ice. Two event bystanders, both of whom were mothers of other participants in the event, left the stands and responded to the medical emergency. Nancy DePalma held a nursing degree and was licensed in California. Linda Albrecht had completed a "First Responder" course and a "Nurse's Aid" course. Albrecht assisted DePalma in administering cardiopulmonary resuscitation (CPR) to Nicholas Rotolo.

Someone named " 'Amy' from Logitech Ice" called 911 to report the incident to the appropriate emergency responders. In addition, Kevin Wardlow, a visiting coach for one of the hockey teams, called 911 on his cellular telephone. Both of these calls were made at approximately the same time, shortly after Nicholas Rotolo collapsed.

Sometime prior to this incident one or more AED's had been acquired and installed at the Logitech Ice facility.[1] Respondents had placed one AED on the wall in the area near the penalty box of the south rink where Rotolo collapsed. An AED is a lightweight medical device used to administer an electric shock to the heart through the chest wall after someone suffers cardiac arrest, in an attempt to restart normal heart rhythm. Microcomputers built into the device assess the person's heart rhythm and signal whether or not to administer the shock. AED's have visual and verbal prompts that guide the user through the rescue effort.

Respondents had not informed the tournament participants, the coaches, the officials, or the spectators of the existence and location of the AED's. No one was aware that an AED was installed and available for use close to the south rink. Neither one of the referees officiating the game was aware of the AED. Both Albrecht and DePalma had been trained and certified in the use of AED's. However, no one informed them that there was an AED nearby. Kevin Wardlow, who placed one of the 911 calls, was asked by the dispatcher whether there was "one of those 'heart shock boxes'." on the premises. Unaware that there was one nearby, Wardlow responded that there was no such device available.

Albrecht and DePalma performed CPR until the arrival of emergency medical personnel, but despite these efforts Nicholas Rotolo did not survive.

The operative pleading here, the third amended complaint, contains one cause of action against respondents for negligence. Appellants alleged that, based on the special relationship between respondents and invitees on their premises, respondents had a duty to provide information and notice to "invitees, including the participants, officials, coaches and members of organizations that defendants regularly invited to participate in athletic events organized and sponsored by defendants on their premises, as to the existence, availability, location and purpose of all medical emergency response equipment, including the AED units, and to effectively establish, disseminate and set into action a medical emergency response plan in the event of an emergency." Appellants alleged that the breach of this duty was a proximate cause of Nicholas Rotolo's death.[2]

---

[1] It is unclear from the record whether these were acquired by the City of San Jose, which was the owner of the property, or by respondents, who were the operators of the facility.

[2] Although the duty alleged by appellants in their third amended complaint was a broad duty to notify various categories of users of the facility of all medical emergency response equipment, including AED's, appellants subsequently narrowed their argument in opposition to the demurrer and here on appeal. Here they argue for a more limited duty: to notify league officials and coaches of the existence and location of any onsite AED's.

In addition to the factual allegations summarized above, appellants' third amended complaint included statements and allegations regarding the history of AED's, the extent of the information respondents may have possessed about AED's, and the use and effectiveness of AED's in treating heart attacks, according to the American Red Cross, the American Heart Association, and several journals in the field of athletic training and sports medicine. In addition, appellants included allegations speculating about the probability that the use of an AED in this case would have been successful in resuscitating Nicholas Rotolo. As is well established, in reviewing a judgment based upon the sustaining of a demurrer we consider all material facts properly pleaded, but "not contentions, deductions or conclusions of fact or law." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].) We will therefore not consider the portions of the third amended complaint that include opinion, speculation, deductions, contentions or conclusions of fact or law.[3]

We acknowledge, however, that the statutes that have been enacted regarding AED's reflect a legislative recognition that AED's can be lifesaving devices, and when used properly and in a timely manner can significantly increase the survival rate of victims of cardiac arrest. (See, e.g., Civ. Code, § 1714.21; Health & Saf. Code, § 1797.196; Gov. Code, § 8455.) These statutes, and the legislative history accompanying them, further reflect legislative policy to encourage greater availability of these devices. It is proper in reviewing a demurrer to consider "matters which may be judicially noticed." (*Serrano v. Priest, supra,* 5 Cal.3d at p. 591.) Such matters may include the legislative history of pertinent statutes. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513].)[4]

---

[3] The trial court granted respondents' motion to strike these portions of the second amended complaint when it sustained the demurrer to that complaint with leave to amend. Respondents renewed their motion with respect to the third amended complaint. However, instead of granting the motion, the court found that it was moot in light of the order sustaining the demurrer without leave to amend.

[4] By order dated July 20, 2006, we granted appellants' request that we take judicial notice of a portion of the legislative history of Assembly Bill No. 2041 (2001–2002 Reg. Sess.), amending the pertinent statutes. On November 22, 2006, simultaneously with the filing of their reply brief, appellants submitted a further request for judicial notice of additional items of legislative history. We will grant this request, notwithstanding its untimeliness. However, to the extent that appellants raise new arguments in their reply brief that are based on these additional materials, we will not consider them. Points raised for the first time in a reply brief need not be considered, as this practice deprives respondent of the opportunity to address and counter the arguments. (*Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997, 1022 [36 Cal.Rptr.3d 592].)

## IMMUNITY STATUTES

Civil Code section 1714.21 and Health and Safety Code section 1797.196 were both enacted in 1999. As initially enacted, Civil Code section 1714.21 provided a qualified immunity for any person who in good faith rendered emergency care by the use of an AED at the scene of an emergency, so long as the person had completed a certified basic CPR and AED use course. Health and Safety Code section 1797.196 provided immunity from liability for persons or entities that acquired AED's, where emergency care was rendered with the AED in accordance with Civil Code section 1714.21, and where "expected AED users" had completed a certified CPR and AED training course. (Health & Saf. Code, former § 1797.196, subd. (b)(3)(A).) In the preamble to Health and Safety Code section 1797.196, the Legislature stated: "It is the intent of the Legislature that an automated external defibrillator may be used for the purpose of saving the life of another person in cardiac arrest when used in accordance with Section 1714.21 of the Civil Code." (Stats. 1999, ch. 163, § 1.)

In 2002 the Legislature amended both statutes because of public response indicating that conditioning the immunity on "expected AED users" having completed a training course actually discouraged the acquisition and use of AED's. The synopsis of Assembly Bill No. 2041 (2001–2002 Reg. Sess.), which amended the statutes, explained that the amendment would "encourage greater availability of these apparently 'fail safe' life-saving devices in public and private buildings across the state by broadening the scope of the current immunity provided. The bill would grant immunity, regardless of prior training, to all 'Good Samaritans' who voluntarily use AED's at the scene of an emergency who help to try to save someone's life, and it would also grant immunity to building owners or others who voluntarily acquire such safety devices to potentially save the lives of building tenants and members of the public, if specified safety standards are met." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2041 (2001–2002 Reg. Sess.) as amended Apr. 16, 2002.)

The amended version of Civil Code section 1714.21, which was the relevant version at the time of the incident in this case, thus grants immunity to anyone using an AED in an attempt to save a life, regardless of any prior training. It provides: "Any person who, in good faith and not for compensation, renders emergency care or treatment by the use of an AED at the scene of an emergency is not liable for any civil damages resulting from any acts or omissions in rendering the emergency care." (Civ. Code, § 1714.21, subd. (b).) As to a person acquiring an AED; the amended statute further provides: "A person or entity that acquires an AED for emergency use pursuant to this section is not liable for any civil damages resulting from any

acts or omissions in the rendering of the emergency care by use of an AED, if that person or entity has complied with subdivision (b) of Section 1797.196 of the Health and Safety Code." (Civ. Code, § 1714.21, subd. (d).)

■ Health and Safety Code section 1797.196, as amended in 2002, similarly provides that building owners and those who acquire and install AED's are not liable for damages resulting from the rendering of emergency care with an AED, without regard to whether the individual using the device has undergone specified training. (Health & Saf. Code, § 1797.196, subd. (b).) Persons or entities acquiring AED's benefit from the statutory immunity only if certain requirements are met, including the following: complying with regulations governing the placement of the AED (*id.,* subd. (b)(1)); ensuring that the AED is regularly maintained, tested, and checked for readiness (*id.,* subd. (b)(2)(A) & (B)); ensuring that anyone using the AED reports its use and activates emergency medical services (*id.,* subd. (b)(2)(C)); ensuring that at least one employee per AED completes a training course (*id.,* subd. (b)(2)(D)); ensuring that there is a written plan describing procedures to be followed in the event of an emergency that may involve use of an AED (*id.* subd. (b)(2)(E)); and ensuring that tenants of a building where an AED is placed are notified of its location and receive a brochure describing its use, and that similar information is posted next to an installed AED (*id.,* subd. (b)(3) & (4)).

Although the statutes provide immunity to those who acquire and install an AED in their buildings in the event the device is used in an emergency situation, the Legislature made clear that it did not intend to impose any duty on building owners and managers to acquire AED's in the first place. Subdivision (f) of Health and Safety Code section 1797.196 provides: "[n]othing in this section or Section 1714.21 may be construed to require a building owner or a building manager to acquire and have installed an AED in any building."

For reference, we include the full text of the two statutes in the appendix, *post.*

## ARGUMENT

### I. *Standard of Review*

On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, the reviewing court assumes the truth of all facts properly pleaded by the plaintiff. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 [40 Cal.Rptr.3d 205, 129 P.3d 394]; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We also

accept as true all facts that may be implied or reasonably inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].) As we have noted, we do not assume the truth of " ' "contentions, deductions or conclusions of fact or law." ' " (*Evans v. City of Berkeley, supra*, 38 Cal.4th at p. 6; see *Serrano v. Priest, supra*, 5 Cal.3d at p. 591.) But relevant matters that are properly the subject of judicial notice may be treated as having been pleaded. (*Evans v. City of Berkeley, supra*, 38 Cal.4th at p. 6; *Schifando v. City of Los Angeles, supra*, 31 Cal.4th at p. 1081.)

"As a general rule, if there is a reasonable possibility the defect in the complaint could be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459–460 [80 Cal.Rptr.2d 329]; see *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810 [27 Cal.Rptr.3d 661, 110 P.3d 914].) "Nevertheless, where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra*, 68 Cal.App.4th at pp. 459–460.) In such cases, "we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790 [90 Cal.Rptr.2d 598]; see also *Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750, 754 [92 Cal.Rptr.2d 132] [application of law to undisputed facts involves pure questions of law, which are subject to independent review on appeal].)

Furthermore, "[t]he question of the existence of a legal duty of care in a given factual situation presents a question of law which is to be determined by the courts alone." (*Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1682 [19 Cal.Rptr.2d 601]; see *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*).) We therefore review de novo the trial court's determination, in sustaining the demurrer without leave to amend, that no duty of care was owed on the pleaded facts of this case. (*Koepke v. Loo* (1993) 18 Cal.App.4th 1444, 1450–1451 [23 Cal.Rptr.2d 34]; *Nichols v. Keller, supra*, 15 Cal.App.4th at p. 1685; *Janik v. Rudy, Exelrod & Zieff* (2004) 119 Cal.App.4th 930, 936 [14 Cal.Rptr.3d 751].)

## II. *Statutory Duty—Legislative Intent*

Appellants concede that Civil Code section 1714.21 and Health and Safety Code section 1797.196, the two statutes summarized above, do not expressly impose a duty on the part of building owners and operators of businesses who

acquire and install AED's to inform business invitees of the existence and location of the devices. Rather, these are statutes that provide immunities to users of AED's, and to those acquiring and installing AED's, when the devices are used to render emergency care. Appellants contend, however, that the evolution of California law regarding AED's clearly reflects a legislative intent to encourage the proliferation and use of AED's in public locations, and that the imposition of a duty in this case is consistent with such a purpose.

As appellants point out, Health and Safety Code section 1797.196 provides that, in order to benefit from the statutory immunity, a building owner acquiring an AED must satisfy specified maintenance and reporting requirements, must notify tenants of the location and proper use of the AED, must ensure that at least one employee for every AED completes an appropriate training course, and must develop a written plan describing procedures to be followed in the event of an emergency that may involve the use of an AED. (Health & Saf. Code, § 1797.196, subds. (b) & (c).) These provisions, appellants argue, indicate an intent on the part of the Legislature to ensure that immediate and effective assistance can be made readily available to persons who might suffer from cardiac arrest. It follows, in appellants' view, that imposing a duty in this case on the operators of an ice hockey rink to notify league officials and coaches of the existence and location of the AED's on the premises would directly further this legislative intent.

Respondents, on the other hand, argue that this court should not insert into the immunity statutes an additional requirement that is not contained, or even implied, therein. In respondents' view, the statutes were intended to encourage the installation and use of AED's by providing immunity from liability for damages resulting from the use of an AED in an emergency situation. If the statutes were read to impose additional duties of notice on those who voluntarily acquire and install AED's, respondents argue, this would tend to discourage building owners from acquiring AED's, and thus would *not* further the purpose of encouraging the proliferation of these lifesaving devices. The Legislature expressly declined to create a duty on the part of building owners to acquire or install AED's. Subdivision (f) of section 1797.196 provides that "[n]othing in this section or Section 1714.21 may be construed to require a building owner or a building manager to acquire and have installed an AED in any building." Respondents argue that since the Legislature provided that building owners and managers have no duty to acquire and install an AED in their buildings, the Legislature cannot have intended that those who do acquire, install and maintain such devices in accordance with the statutory requirements could be vulnerable to liability if the device is not used.

We agree with respondents' interpretation of these statutes. Civil Code section 1714.21 and Health and Safety Code section 1797.196 clearly do not impose the duties of notice that appellants propose. Nor can such duties reasonably be implied from the language of these statutes. And, in our view, imposition of such duties would not further the express legislative purpose to encourage widespread use of AED's.

■ In determining legislative intent, which is our primary task in interpreting a law, we look first to the language of the statute. "Where possible, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . .' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [3 Cal.Rptr.3d 636, 74 P.3d 737]; see *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) The intent of these statutes is clearly expressed—to encourage the use of AED's "for the purpose of saving the life of another person in cardiac arrest . . . ." (Stats. 1999, ch. 163, § 1.) The method chosen by the Legislature to achieve this end was to provide immunities where an AED is used in an attempt to save a life, both for those using the device (Civ. Code, § 1714.21), and also for those who have made it available for use. (Health & Saf. Code, § 1797.196.) The immunities provided are intended to protect users of AED's, and those who acquire AED's, when the AED is used. Appellants are not within the class of persons the statutes were intended to protect. And the statutes plainly do not apply to circumstances such as those before us, where the AED was acquired and installed but no one used it. Furthermore, although Health and Safety Code section 1797.196 sets forth specific requirements for the building owner or operator to comply with in order to benefit from the statutory immunity, no language in the statute provides, or reasonably implies, that such a person or entity must give notice to specific members of the public using the building.

Appellants argue that such a duty would further the purpose of the statutes, namely to encourage the use of AED's to save lives. They contend that this court should "fill a void that the Legislature has failed to fill but that is consistent with policies it has expressed." However, we have no power to rewrite a statute by implying additional provisions we believe would further legislative purpose. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 741; *Estate of Horman* (1971) 5 Cal.3d 62, 77 [95 Cal.Rptr. 433, 485 P.2d 785] [courts "do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature."].) This rule of judicial restraint is particularly appropriate where the statutes, as here, are detailed and comprehensive, thus indicating an intent by the Legislature to "occupy the field" as to regulation of AED's. (See, e.g., *County of Santa Cruz v. Waterhouse* (2005) 127 Cal.App.4th 1483, 1489 [26 Cal.Rptr.3d 543]; *Rojo v. Kliger* (1990) 52 Cal.3d 65, 74–75 [276 Cal.Rptr. 130, 801 P.2d 373].)

Furthermore, the language of the statutes reflects that the Legislature specifically considered questions of duty and notice when writing these laws. It expressly provided that the statutes were *not* to be construed to impose a duty on the part of persons or entities owning or managing a building to acquire and install an AED. (Health & Saf. Code, § 1797.196, subd. (f).) If a building owner does acquire an AED, the statute lists a number of specific requirements, including training, notice to tenants, and development of an emergency plan, which must be met in order for the immunities to apply when the AED is used in an emergency situation. The extent of the notice required by building owners is to provide tenants a brochure every year "which describes the proper use of an AED" and to post similar information "next to any installed AED." (Health & Saf. Code, § 1797.196, subd. (b)(3).) The Legislature thus made a determination of the limits of the notice required by the building owner. Providing notice to visitors or invitees using the building is not included as a requirement. The only other notice requirement set forth by the Legislature applies to a person or entity who *supplies* an AED, who must "[n]otify an agent of the local EMS agency of the existence, location, and type of AED acquired." (Health & Saf. Code, § 1797.196, subd. (c)(1).)[5]

■ "When one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73 [109 Cal.Rptr.2d 1, 26 P.3d 332].) Since the Legislature included in these statutes express provisions regarding duty and notice with respect to AED's, we conclude that the failure to include the duty of notice appellants propose is reflective of a legislative intent to not impose such a duty. If the Legislature had wished to impose additional duties on building owners acquiring AED's, or had wished to add further notice requirements, it plainly knew how to do so and would have done so expressly and directly. (*Schifando v. City of Los Angeles, supra*, 31 Cal.4th at p. 1094; *Rojo v. Kliger, supra*, 52 Cal.3d at p. 75.) Under settled principles of statutory construction, and in the absence of clear evidence to the contrary, we therefore conclude that the Legislature did not intend to impose any duty on property owners or managers who have acquired and installed AED's to inform those using the property of the existence and location of the devices, and that such a duty cannot reasonably be implied from the statutory language. If appellants contend that such a duty would be consistent with the statutes and would further the purpose underlying them, their remedy is to seek legislative change.

---

[5] It is not alleged that respondents were the suppliers of an AED, subject to subdivision (c)(1) of Health and Safety Code section 1797.196. According to respondents, the AED's in this case were supplied by the San Jose Fire Department.

III. *Common Law Duty*

■ There is precedent for courts to recognize a duty under common law that is independent of a legislative scheme but consistent with it. (See, e.g., *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 61 [27 Cal.Rptr. 697, 377 P.2d 897] [court adopted common law warranties independent of statutes but drawing on statutory definitions].)

"As a general principle, 'a defendant owes a duty of care to all persons who are foreseeably endangered by his [or her] conduct, with respect to all risks which make the conduct unreasonably dangerous.' " (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434–435 [131 Cal.Rptr. 14, 551 P.2d 334].) Civil Code section 1714 states the rule that "[e]veryone is responsible, . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property . . . ." (Civ. Code, § 1714.) On the other hand, "[a] person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another . . . ." (*Williams v. State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137] (*Williams*).) "This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter." (*Tarasoff v. Regents of University of California, supra*, 17 Cal.3d at p. 435, fn. 5.)

■ Although the general rule of nonliability is that "no one is required to save another from a danger which is not of his making" (*Andrews v. Wells* (1988) 204 Cal.App.3d 533, 539 [251 Cal.Rptr. 344]; see *Williams, supra*, 34 Cal.3d at p. 23), courts have recognized exceptions to this rule where there is some "special relationship" between the parties, giving rise to a duty to act. (*Delgado, supra*, 36 Cal.4th at p. 235.) Typically, in special relationships, "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare. [Citation.]" (*Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 499 [71 Cal.Rptr.2d 552].) A defendant who is found to have a "special relationship" with another may owe an affirmative duty to protect the other person from foreseeable harm, or to come to the aid of another in the face of ongoing harm or medical emergency. (*Delgado, supra*, 36 Cal.4th at p. 235; *Morris v. De La Torre* (2005) 36 Cal.4th 260 [30 Cal.Rptr.3d 173, 113 P.3d 1182] (*Morris*); *Breaux v. Gino's, Inc.* (1984) 153 Cal.App.3d 379 [200 Cal.Rptr. 260] (*Breaux*).)

A special relationship has been found to exist between a property owner or manager and invitees, such as that between the operator of a bar or restaurant and patrons of the business (*Delgado, supra*, 36 Cal.4th 224; *Morris, supra*, 36 Cal.4th 260), or the owner of a shopping center and the employees or customers using the premises. (*Ann M., supra*, 6 Cal.4th at p. 674.) In the

sports context, special rules define the scope of a duty of the operator of a sports facility to use due care to not increase the risks inherent in the sport. (*Knight v. Jewett, supra*, 3 Cal.4th at pp. 315–316.) A further exception to the no-duty-to-act rule is the "negligent undertaking" doctrine, under which a person who initially has no duty to act to protect another undertakes to do so, and thereby increases the risk of harm or induces reliance. (*Delgado, supra*, 36 Cal.4th at pp. 248–249; *Williams, supra*, 34 Cal.3d at p. 23; *City of Santee v. County of San Diego* (1989) 211 Cal.App.3d 1006, 1012 [259 Cal.Rptr. 757].)

We will discuss these doctrines as applied to the circumstances of this case, and then respond to appellants' general policy arguments in support of imposition of a duty in this case.

### A. *Special Relationship—Premises Liability*

■ Courts have found that a " 'special relationship' " exists between business proprietors and their patrons or invitees (*Ann M., supra*, 6 Cal.4th 666, 674; see *Delgado, supra*, 36 Cal.4th at pp. 244–247) or between property owners or managers and those using the property. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573] (*Frances T.*).) Such a relationship gives rise to a duty to maintain the premises in a "reasonably safe condition" (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1189 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on another point in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 865, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493]), and may include a duty to take affirmative measures, either to prevent foreseeable harm from occurring to those using the premises, or to come to the aid of a patron or invitee in the face of ongoing or imminent harm or danger. (*Delgado, supra*, 36 Cal.4th at pp. 235–238.)

For example, in *Frances T., supra*, 42 Cal.3d 490, the plaintiff was attacked at night in her condominium unit. She sued the owners association for negligence based on the theory that the association had a duty, similar to a landlord, to take action to maintain the common areas under its control in a safe condition for the residents. The plaintiff pleaded particularized facts, alleging that the association was aware of reports and complaints about various nighttime crimes on the premises, was aware of the link between crime on the premises and the lack of lighting in the common areas, and had failed to respond in a timely manner to requests for more exterior lights. The court concluded that these alleged facts were sufficient to show the existence of a duty on the part of the association and a breach of that duty. (*Id.* at p. 499.)

Similarly in *Ann M., supra*, 6 Cal.4th 666, the court found that the proprietors of a shopping center had a "general duty of maintenance, which is

owed to tenants and patrons, . . . [and which] include[s] the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures." (*Id.* at p. 674.) The scope of the duty, the court wrote, "is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed." (*Id.* at p. 678.) " ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." ' " (*Id.* at pp. 678–679.) In *Ann M.,* the court concluded in the circumstances of that case that there was not a sufficiently high degree of foreseeability to impose a duty on the landlord to provide security guards to patrol the shopping center premises.

In *Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th 1181 (*Sharon P.*), the court again applied this balancing test in a case where the plaintiff was attacked in a parking garage underneath a commercial office building. As in *Ann M.,* the court in *Sharon P.* concluded that the circumstances did not demonstrate a sufficiently high degree of foreseeability of crimes of the kind suffered by the plaintiff in order to justify imposing the burdensome duty on the defendant to undertake security measures such as installing lighting, monitoring security cameras or providing security guards on the premises. (See also *Delgado, supra,* 36 Cal.4th at pp. 236–240, where the Supreme Court reviewed the development of the law regarding premises liability based on a special relationship, and adopted the balancing test set forth in *Ann M., supra,* 6 Cal.4th at pp. 678–679.)

Appellants reason from the principles expressed in these cases. They point out, and respondents concede, that a "special relationship" existed between respondents, who operated the Logitech Ice facility, and the sports participants playing hockey at the facility. Based on this special relationship, appellants argue that respondents had a duty to undertake affirmative and "relatively simple measures" to prevent foreseeable harm, namely the death of a participating athlete from cardiac arrest. (*Delgado, supra,* 36 Cal.4th at p. 241.) In their third amended complaint, appellants alleged that it is "common knowledge" that cardiac arrest is the leading cause of death among athletes who participate in strenuous sports activities. Because respondents had acquired AED's, appellants alleged that respondents had "actual or constructive knowledge" of the effectiveness of an AED in treating victims of cardiac arrest. Appellants also alleged there had been a prior incident at another facility where an ice hockey player in the same league was successfully resuscitated by using an AED. Appellants argue that because of the high incidence of cardiac arrest among athletes, and the possibility that a victim of cardiac arrest could die without timely intervention with a defibrillator, it is

therefore reasonably foreseeable that an athlete using the Logitech Ice hockey facility could succumb to such a fatal injury.

Appellants argue that common law supports imposing an affirmative duty to prevent such an occurrence here, where there is a special relationship between respondents and those using the ice hockey facility, coupled with a high degree of foreseeability of the harm that occurred in this case. In defining this duty, their third amended complaint cites to various sports journals, asserting that effective emergency planning is a necessary component of participant safety at sports venues. Thus they conclude that respondents were duty bound to institute a reasonable emergency plan to ensure that those using the Logitech Ice facility were made aware of the existence and location of the AED's, so that participating athletes suffering cardiac arrest could receive timely and effective treatment. Appellants argue that the duty they seek to impose on respondents—to notify league officials and coaches of the existence and location of the AED's—amounts to a "minimal burden" that could prevent the foreseeable harm that occurred here. (*Delgado, supra,* 36 Cal.4th at p. 243.) Thus they contend that the balancing test set forth in the premises liability cases weighs in favor of imposing a duty in this case.

We disagree, for several reasons. First, knowledge of statements made in various sports journals and other publications cannot be imputed to respondents. As we have noted, in reviewing a judgment entered upon the sustaining of a demurrer, we do not accept as true " ' "contentions, deductions or conclusions of fact or law." ' " (*Evans v. City of Berkeley, supra,* 38 Cal.4th at p. 6.) Opinions and statistical studies contained in such publications are not proper matters to be included in pleadings. Moreover, it cannot be reasonably inferred that respondents had knowledge of an incident involving another athlete at a different facility.

Furthermore, even if it can be reasonably inferred from respondents' acquisition of the AED's for their facility 1) that they were aware that cardiac arrest can occur among athletes and 2) that they were further aware that the timely use of an AED can increase the chances of resuscitating a victim of cardiac arrest, these circumstances do not bring this case within the rules set forth in the premises liability cases discussed above. Those cases involve a proprietor's duty to take steps to prevent harm from occurring to its patrons as a result of foreseeable criminal conduct by others. As the court found in *Frances T.,* a defendant's failure to provide lighting in common areas, knowing that the lack of lighting was linked to criminal activity, could constitute a breach of duty. Here, however, although cardiac arrest among athletes may be foreseeable, the occurrence of such an injury cannot be prevented or protected against by any precautionary measures taken by the operators of the premises. Rather, an injury of this nature is a risk inherent in

playing the sport, as we discuss more fully below. Unlike *Frances T.,* and the other premises liability cases, nothing respondents did or did not do in this case invited or led to the cardiac arrest suffered by Nicholas Rotolo.

Appellants further contend, however, that respondents' general duty to maintain a safe facility for the athletes using its facility included taking steps to ensure that in the event an athlete did suffer from cardiac arrest, the AED would be used in a timely manner. Appellants argue that even where a property owner or proprietor has not created the peril or increased the risk of harm to a patron, courts have found a special-relationship-based duty to act in the face of imminent danger or ongoing harm to a patron or invitee on the property. Two recent Supreme Court cases discuss the duty imposed in such circumstances. In *Delgado, supra,* 36 Cal.4th 224, the Supreme Court wrote that "a restaurant or bar proprietor . . . has a duty to warn patrons of known dangers [citation] and, in circumstances in which a warning alone is insufficient, has a duty to take other reasonable and appropriate measures to protect patrons or invitees from imminent or 'ongoing' criminal conduct. [Citation.] Such measures may include telephoning the police or 911 for assistance [citation], or protecting patrons or invitees from an imminent and known peril lurking in a parking lot by providing an escort by existing security personnel to a car in that parking lot." (*Id.* at p. 241.)

In *Delgado,* the defendant bar owner had hired a security guard, who became aware that hostilities were mounting between the plaintiff and another group of customers in the bar and decided to separate them by asking the plaintiff to leave. However, the guard took no further action when the other customers followed the plaintiff outside. The plaintiff was subsequently attacked and beaten in the parking lot. The court found under these circumstances that because the defendant had *actual notice* of an impending assault involving a bar patron, "its special-relationship-based duty included an obligation to take reasonable, relatively simple, and minimally burdensome steps to attempt to avert that danger." (*Delgado, supra,* 36 Cal.4th at p. 250.)

In the companion case, *Morris, supra,* 36 Cal.4th 260, filed the same day, the plaintiff was attacked in the parking lot outside a restaurant, in full view of restaurant employees. The attacker had run into the restaurant and grabbed a knife from the kitchen, which he used to stab the plaintiff numerous times. Restaurant employees who watched the entire altercation failed to call 911 or take other minimally burdensome measures. The court found that the proprietor had no duty in this case to hire security guards or to take other anticipatory actions to prevent an attack on its patrons by third parties. However, it did have a duty to take reasonable steps under the circumstances to aid the plaintiff in the face of an ongoing criminal attack on the premises. The court found "as a general matter a proprietor's special-relationship-based

duty to its patrons or invitees includes an obligation to make [a 911] call, or to take other similar minimal measures." (*Id.* at p. 277.)

Appellants rely on *Delgado* and *Morris*, and on several prior Supreme Court cases where the court reaffirmed the basic principle that proprietors of businesses owe a duty to invitees to protect them from foreseeable harm. (See *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 791 [221 Cal.Rptr. 840, 710 P.2d 907]; *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 123–124 [52 Cal.Rptr. 561, 416 P.2d 793].) They argue that these cases support imposing a duty on respondents here, to take reasonable measures to prevent serious harm from cardiac arrest occurring to the athletes using the facility. And they contend that in the balancing test set forth in *Ann M.*, and adopted by the court in *Delgado,* the foreseeability of such harm among athletes is high, whereas the duty of providing notice of the location of the AED's to those using the facility, so that effective assistance can be provided, is a minimal one.

We do not believe the *Delgado* and *Morris* cases support imposition of the duty appellants propose here. First, both *Delgado* and *Morris* involved patrons of a bar or restaurant being injured by third parties in a fight outside the establishment. A somewhat different duty analysis applies in those cases. In *Delgado,* the court found certain characteristics of the special relationship are "especially relevant" to the duty determination. For instance, in circumstances where a proprietor serves alcohol on the premises, there is a preexisting affirmative duty to exercise reasonable care to protect its patrons from injury at the hands of fellow guests, who may have become inebriated. (*Delgado, supra*, 36 Cal.4th at p. 241; see also *Taylor v. Centennial Bowl, Inc., supra*, 65 Cal.2d 114 [warning to bar patron was not sufficient to discharge the affirmative duty to protect her from another customer harassing her].) Other situations where the defendant's relationship to the plaintiff is especially relevant are common carrier cases (*Lopez v. Southern Cal. Rapid Transit Dist., supra*, 40 Cal.3d at p. 785 [preexisting duty of a common carrier to protect passengers from assault by fellow passengers]) or a school setting (*Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448 [249 Cal.Rptr. 688] [a school district has a duty to take reasonable measures to protect its students from third party criminal attacks].) Here respondents, who provide a venue for those who wish to participate in sports events, are not subject to the same heightened duty of care to protect invitees as are bar proprietors, common carriers, or school districts.[6]

---

[6] Appellants' out-of-state cases also involve the heightened duties of care of a school in the event of an injury to a student athlete. (*Kleinknecht v. Gettysburg College* (3d Cir. 1993) 989 F.2d 1360; *Stineman v. Fontbonne College* (8th Cir. 1981) 664 F.2d 1082.)

*Delgado* and *Morris* are further distinguishable in that the analysis in those cases focused on the scope of a business owner's duty to respond to unfolding events on the property involving ongoing or imminent harm to a patron from a third party's assaultive conduct. In *Delgado,* the defendant had actual notice that a fight was developing and that the plaintiff was in danger. In *Morris,* the attack on the plaintiff was actually occurring. In both cases, the court concluded that in the face of such an imminent or actual attack on a patron, the proprietor had a duty to take reasonable steps to respond to protect the plaintiff. In contrast, the duty appellants seek to impose here is not a duty to respond when athletes such as Nicholas Rotolo suffer from cardiac arrest. Rather appellants would impose a duty on a proprietor to take anticipatory action prior to any ongoing or imminent harm to a plaintiff, by giving notice to specific persons that AED's are on the premises in the event such harm occurs. Although their pleading included an allegation that "defendants and/or their agents or employees did not respond to the medical emergency or set in motion any medical emergency response," that is not the basis for their assertion of liability here. Furthermore, the record, including appellants' responses to interrogatories, shows that respondents did respond—a person named " 'Amy' from Logitech Ice" called 911 shortly after Nicholas Rotolo collapsed on the ice, and she reached emergency services at approximately the same time as a bystander using a cell phone. Thus respondents in this case took the steps to respond to the emergency that the defendant in *Morris* did not.

Courts have not required more from the proprietor of a business where a patron becomes ill or has a medical emergency on the premises. As the court stated in *Delgado,* "it long has been recognized that restaurant proprietors have a special-relationship-based duty to undertake relatively simple measures such as providing 'assistance [to] their customers who become ill or need medical attention and that they are liable if they fail to act.' [Citations.] . . . Such measures may include telephoning the police or 911 for assistance." (*Delgado, supra,* 36 Cal.3th at p. 241.) The case cited by the court in *Delgado* for this proposition is *Breaux, supra,* 153 Cal.App.3d 379. In that case, a restaurant patron choked while eating. An assistant manager of the establishment called for an ambulance but did not attempt to give first aid. The court recognized a special-relationship duty of a proprietor of a business establishment to offer assistance to customers needing medical attention, but found that such a duty was limited. The restaurant proprietor had complied with Health and Safety Code former section 28689,[7] in effect at the time, which required posting in an appropriate place the state-approved first aid instructions for removing food obstructing a person's throat. The court found that the extent of the duty of a proprietor in such circumstances was to comply with the statute and to summon emergency services.

---

[7] This section is now contained in Health and Safety Code section 114180.

The court in *Breaux* observed that policy decisions, such as what losses are compensable, are properly within the province of the Legislature. In that case, the Legislature had established the standards for the conduct of restaurant owners in the event that patrons choke on their food. The relevant statute provided that, although the restaurant owner was required to' post first aid instructions for removing food from a person's throat, there was no duty to physically assist the person choking. (*Breaux, supra,* 153 Cal.App.3d at p. 382; Health & Saf. Code, former § 28689.) The court concluded that this statute established the limits of the restaurant owner's duties as to the specific harm as a matter of law, and that the restaurant met its special-relationship-based duty to a patron in distress when it summoned emergency services. (*Breaux, supra,* 153 Cal.App.3d at p. 382)

Similarly, in the case before us the Legislature has limited the duties of a building owner with respect to providing assistance with an AED. First, there is no duty to acquire an AED or have it available. Second, if there is an AED, and if injury results from its use, the owner is not liable if the owner complies with certain statutory requirements. Here, as in *Breaux,* respondents are not in violation of any statutory duty. Under *Breaux,* which was cited with approval by the Supreme Court in *Delgado,* the sole duty based on the special relationship of the premises owner towards invitees to provide assistance in the face of a medical emergency was to summon emergency services. The record here indicates that a number of people, including " 'Amy' from Logitech Ice," called 911 to summon emergency services shortly after Nicholas Rotolo collapsed on the ice. The law does not extend the duty of a business owner any further than this.

Appellants argue that the duty in this case was not to protect patrons from foreseeable harmful conditions on the premises, or to respond to a medical emergency; rather, the nature of the duty here was to institute reasonable measures that would minimize the effects of the foreseeable harm. One such reasonable measure would be to notify specific persons using the sports facility of the existence and location of AED's, so that the devices would be more likely to be used in the event an athlete suffers cardiac arrest. We have found no precedent for extending the special relationship doctrine in this fashion. The limits of the special relationship doctrine, as the cases illustrate, are that a person in control of property must maintain the property in "a reasonably safe condition." (*Sharon P., supra,* 21 Cal.4th at p. 1189.) This may include taking steps to prevent the occurrence of foreseeable harmful conduct by third parties (*Frances T., supra,* 42 Cal.3d at p. 499); taking reasonable steps to assist a patron facing particular imminent harm on the premises (*Delgado, supra,* 36 Cal.4th at p. 250); and summoning aid in the face of an ongoing injury or medical emergency. (*Morris, supra,* 36 Cal.4th at

p. 277; *Breaux, supra,* 153 Cal.App.3d at p. 382.) None of these authorities supports the imposition of a duty on respondents in the circumstances of this case.

### B. *Duties of the Operator of a Sports Facility*

Appellants point out that in the sports context, recent trends in the law recognize legal duties on the part of the operators of sports facilities to ensure participant safety. (See, e.g., *Leon v. Family Fitness Center (#107), Inc.* (1998) 61 Cal.App.4th 1227 [71 Cal.Rptr.2d 923] [fitness center]; *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078 [39 Cal.Rptr.3d 425] [swimming pool]; *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 134 [40 Cal.Rptr.2d 249] [golf course]; *Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184 [43 Cal.Rptr.2d 392] [motocross park course].) They cite these cases in support of their contention that operators of sports facilities have a special-relationship-based duty to take simple affirmative measures to prevent the kind of harm that occurred here.

Although appellants rely on the special relationship doctrine to argue that Logitech Ice had an affirmative duty to provide a safe arena for participating athletes, the cases cited by appellants in support of this argument are not based on the special relationship doctrine. Instead, recognizing that a person who participates in a sport assumes the risk of an injury incurred while playing the sport, these cases analyze the scope of the duty of operators of a sports facility by applying comparative fault principles under a doctrine known as the secondary assumption of risk doctrine. In other words, although a plaintiff primarily assumes the "risks inherent in the sport itself," defendants also have a "duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 315–316; see also *Nemarnik v. Los Angeles Kings Hockey Club* (2002) 103 Cal.App.4th 631, 636–637 [127 Cal.Rptr.2d 10].)

The cases relied upon by appellants illustrate the application of this secondary assumption of risk doctrine. In *Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th 127, a golfer sued the owner and operator of a golf course when he was hit by a ball. Although the player assumed the risk of injury inherent in playing golf, including getting hit by errant balls, the court found that the golf course owner also had a duty "to provide a reasonably safe golf course. This duty requires the golf course owner 'to minimize the risks without altering the nature of the sport.' " (*Id.* at p. 134.) Thus the golf course owner could be liable for comparative negligence if the design and layout of the course contributed to the injury by providing a particularly high likelihood of balls landing where other players were standing.

In *Branco v. Kearny Moto Park, Inc., supra*, 37 Cal.App.4th 184, the court similarly found that although motocross racing was an inherently dangerous sport, and the participants assumed the risk, the sponsor of the race also had a duty not to *increase* the danger by designing a jump creating an extreme risk of injury. Applying the secondary assumption of risk doctrine, the court held that the limit of defendant's duty was to design and maintain a course that did not unreasonably increase the risks inherent in the sport.

Because participants in a sport assume the risk of injury inherent in the sport, cases discussing the nature of the duty of operators of sports facilities have applied this secondary assumption of risk analysis, rather than general principles of premises liability. (See *Capri v. L.A. Fitness International, LLC, supra*, 136 Cal.App.4th 1078 [duty not to let algae grow on pool deck, making it unusually slippery and dangerous]; *Leon v. Family Fitness Center (#107), Inc., supra*, 61 Cal.App.4th 1227 [fitness center had duty to maintain bench in sauna in reasonable repair]; *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173 [119 Cal.Rptr.2d 497] [marathon organizers have duty to minimize risks of dehydration by providing water along the course].)

The doctrine of secondary assumption of risk results in apportioning responsibility where it is found that the owner or operator of a sports facility has contributed to the harm by designing or maintaining a facility in such a way as to unreasonably increase the risks inherent in the sport. The doctrine does not apply here, and appellants have not pleaded facts to support it. There is no allegation that respondents maintained their facility in an unsafe manner or unreasonably increased the risk that the athletes using it would succumb to cardiac arrest, as Nicholas Rotolo did. Appellants concede as much. As appellants themselves have emphasized, sudden cardiac arrest is a risk inherent in playing strenuous sports.

Since the primary assumption of risk doctrine bars recovery for injuries arising from risks inherent in the sport, appellants seek to impose liability on respondents here on the basis of a special-relationship-based duty. However, imposition of such a duty would require respondents, who are not responsible for the injury, to take steps to prevent those who do suffer such injury from experiencing the severe consequences of it. Appellants seek to recharacterize the nature of the "injury" here. The injury is not, they argue, the cardiac arrest suffered by the athlete. Rather the risk of injury is that athletes could suffer serious, and perhaps fatal, consequences from an incident of cardiac arrest. Respondents' failure to give notice of the AED's thus increased this risk of harm. We have found no authority for the proposition that a sports facility operator has a duty to reduce the effects of an injury that is an inherent risk in the sport, or to increase the chances of full recovery of a participant who has suffered such a sports-related injury, or to give notice

regarding any first aid equipment that may be available for such a purpose. The cases cited by appellants involving operators of sports facilities do not support the imposition of a duty in the circumstances here. No such duty is found in the law, either under the special relationship doctrine or the doctrine of secondary assumption of risk.

## C. *Negligent Undertaking*

A further exception to the general rule that there is no duty to take affirmative action to assist or protect another is the so-called "negligent undertaking" doctrine. Under this doctrine, courts have found that a duty may be created or assumed where a person who otherwise has no duty to act "undertakes to come to the aid of another." (*Williams, supra*, 34 Cal.3d at p. 23; see *Delgado, supra*, 36 Cal.4th at p. 249.) In effect, the initial undertaking creates a "special relationship" between the volunteer and the one being helped, giving rise to a duty to use due care. (*Delgado, supra*, 36 Cal.4th at p. 249; *Williams, supra*, 34 Cal.3d at p. 24.) The doctrine is a limited one, however. "A defendant's undertaking will support the finding of a duty to another only if (a) the defendant's action increased the risk of harm to another, or (b) the other person reasonably relied upon the undertaking to his or her detriment." (*Delgado, supra*, 36 Cal.4th at p. 250.)

While not invoking this doctrine by name, appellants' pleading contains the elements of it. Their third amended complaint alleges that "[b]y acquiring and installing the AED unit, defendants voluntarily assumed a duty to use reasonable care in the method by which they made such equipment available for use by those present at the time of an emergency." Appellants contend that, like the defendant in *Delgado* who voluntarily hired security guards to protect bar patrons from harm, respondents here voluntarily took steps to maintain a safe environment for the athletes by acquiring and installing AED's. Therefore, they were under a duty to make reasonable use of the AED's in order to save lives, the purpose for which they were intended, just as the defendant in *Delgado* assumed a duty to use the security guards in a reasonable fashion to protect its patrons from criminal assault.

Even if we were to accept the proposition that respondents' acquisition of an AED amounted to an undertaking to come to the aid of another, within the meaning of the doctrine, appellants' analogy to *Delgado* does not withstand scrutiny. The court in *Delgado* did not apply the negligent undertaking doctrine in reaching its result. The court in fact rejected the argument that, by undertaking to hire a guard, a proprietor necessarily assumes a duty to ensure that the guard protects its patrons. (*Delgado, supra*, 36 Cal.4th at pp. 249–250.) The court found instead that the duty arose in that case because the guard was aware of specific facts indicating that a particular patron would

be the target of a likely attack by other patrons if the two groups were not separated. It was because of the actual notice of an impending assault on the plaintiff that the court found that the defendant had an obligation to take relatively simple steps to avert that particular danger. (*Id.* at p. 250.)

Furthermore, the other components of the negligent undertaking doctrine are lacking here. Although respondents had no duty to acquire and install the AED's in their facility, and voluntarily undertook to do so, this conduct did not in any way "increase[] the risk of harm" to Nicholas Rotolo or the other participants using the facility. (*Delgado, supra,* 36 Cal.4th at p. 250.) And since neither Rotolo nor anyone else participating in or watching the hockey game knew about the AED's, it cannot be said that they "reasonably relied" on respondents' conduct. (*Ibid.*)

Finally, we note that the negligent undertaking doctrine is not favored in the law, and many cases discussing its principles, including *Delgado,* have refused to apply it. (See *Williams, supra,* 34 Cal.3d 18 [highway patrol officer undertaking to come to the aid of stranded motorist does not create a special relationship giving rise to affirmative duties in conduct of the investigation]; *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604 [76 Cal.Rptr.2d 479, 957 P.2d 1313] [recognizing potential duty to act pursuant to negligent undertaking doctrine, but finding no such undertaking, and hence no such duty]; *City of Santee v. County of San Diego, supra,* 211 Cal.App.3d 1006 [voluntary reporting of streetlight outages does not create affirmative duty to continue reporting]; *Paz v. State of California* (2000) 22 Cal.4th 550 [93 Cal.Rptr.2d 703, 994 P.2d 975] [rejecting negligent undertaking doctrine because defendant's failures did not increase risk of harm].)

D. Rowland v. Christian *Factors*

■ The existence and scope of a duty is essentially a policy decision involving the balancing of a number of considerations. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 398–399 [11 Cal.Rptr.2d 51, 834 P.2d 745].) As our Supreme Court summarized in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561], these considerations may include: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at p. 113.) Appellants assert that a balancing of these factors weighs in favor of finding a duty in the circumstances here. We disagree.

Again appellants assert that sudden cardiac arrest is the leading cause of death among athletes. They argue that statistics show there is a virtual certainty that a person who experiences cardiac arrest will die unless defibrillation occurs within minutes. They contend, therefore, that there is a high degree of foreseeability that death will occur in the absence of the timely use of an AED. Crucial to providing this aid is an emergency plan by the operators of a sports facility that informs those supervising the sporting event of the existence and location of the AED's in the facility. Appellants further contend that the connection between respondents' conduct and the injury suffered by Nicholas Rotolo was close, because if league officials and coaches had been informed that there was an AED installed near where Nicholas collapsed, and the device had been used by those administering aid to him, he would have had a greatly increased probability of survival.

Even assuming, however, that respondents possessed a general knowledge that athletes may succumb to sudden cardiac arrest during strenuous activities, they could not have prevented such an occurrence, which is a risk assumed by those playing the sport. There is therefore no close connection between anything respondents did or did not do and the injury suffered by Nicholas Rotolo that led to his death. The fact that statistically the chances of surviving an incident of cardiac arrest are increased by the timely use of a defibrillator, even if this knowledge is imputed to respondents, does not give rise to a duty on respondents' part to take affirmative steps to ensure that the device will be used in appropriate circumstances, particularly considering that the Legislature expressly has found no duty to acquire or install an AED in the first place. Furthermore, appellants' foreseeability argument neglects to take into account either the limitations on the duty imposed on the operator of a sports facility "to use due care not to increase the risks to a participant over and above those inherent in the sport," (*Knight v. Jewett, supra*, 3 Cal.4th at pp. 315–316) or the limitations on the duty of a proprietor of a business to provide assistance to a patron experiencing a medical emergency. (*Breaux, supra*, 153 Cal.App.3d 379.)

Appellants also argue that respondents bear moral blame for failing to implement an emergency response plan to inform league officials and coaches of the availability of the AED, thus making it more likely that the device would have been available for use to resuscitate Nicholas Rotolo. However, this factor in the duty analysis is intended to describe a high degree of moral culpability beyond that associated with ordinary negligence. " 'Moral blame has been applied to describe a defendant's culpability in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts. To avoid redundancy with the other *Rowland* factors, the moral blame that attends ordinary negligence is generally not sufficient to tip the balance of the *Rowland* factors in favor of liability. [Citation.] Instead, courts have required a higher degree of moral culpability such as where the

defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or (4) engaged in inherently harmful acts [citation].' " (*Martinez v. Bank of America* (2000) 82 Cal.App.4th 883, 896 [98 Cal.Rptr.2d 576], quoting *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 270 [80 Cal.Rptr.2d 196].) We cannot find that this degree of moral blame is present here.

 Appellants argue that imposing a minimal duty upon operators of sports facilities to notify specified users of the facility of the availability of AED's will further the policy of preventing harm, by making it more likely that these lifesaving devices will actually be used to resuscitate victims of cardiac arrest. On the other hand, imposing duties of notice on countless building owners throughout the state, in addition to the requirements expressly set forth in the statutes regulating the use of AED's, could easily discourage building owners from acquiring the devices in the first place, because of the possibility of incurring liability for failing to take some action that is nowhere defined or described in the statutes or in common law. The Legislature has clearly expressed that owners and managers of property do not have a duty to acquire AED's. (Health & Saf. Code, § 1797.196.) But it has sought to encourage acquisition of AED's by delimiting the duties of the building owner and by providing unqualified immunity from liability resulting from the use of an AED, if certain requirements are met. The goal of encouraging building owners to acquire and install AED's, even though they have no duty to do so, would not be furthered if courts were to impose duties on building owners acquiring AED's beyond those delineated in the statutes, thus creating uncertainty as to the scope of the immunity provided. Imposing the duty appellants propose would create the anomalous result that building owners who do not acquire AED's would have no potential for liability if a person dies as a result of cardiac arrest in their building, whereas an owner who does acquire an AED, but fails to give notice or gives incomplete or improper notice, could be liable. We do not believe public policy is served by such a result.

Appellants contend that the duty of notice they seek to impose here is "minimally burdensome" (*Delgado, supra*, 36 Cal.4th at p. 250) when considering that lives could possibly be saved by the timely use of an AED. Without question, the death of Nicholas Rotolo was a tragic loss, particularly since it appears that an AED was readily available but was not employed. However, decisions as to what losses are compensable are policy determinations we believe are best left to the Legislature, which in this case has established detailed standards for the use and regulation of AED's. The Legislature has seen fit to not impose any duties of notice on building owners who acquire AED's, other than those specifically delineated in the statute.

Although the duty appellants seek to impose may appear, in retrospect, to be minimally burdensome, it is not our role to second-guess the Legislature on matters of policy by expanding the express limitations set forth in the statute.

IV. *Summary*

■ The Legislature, in order to encourage the proliferation of AED's, has provided that owners and operators of buildings who voluntarily acquire and install AED's are immune from liability for damages resulting from the use of an AED in an emergency situation, provided that they meet certain specified requirements. Consistent with the purpose of encouraging building owners to install AED's, the history of Civil Code section 1714.21 and Health & Safety Code section 1797.196 reflects an intent to provide the broadest possible immunities to them. The statutes are detailed and contain several provisions governing who must give notice and the types of notice required. (Health & Saf. Code, § 1797.196, subds. (b)(3), (4), (c)(1). Nothing in the statutes imposes a duty on building owners to give notice of the existence or location of the installed AED's, such as that proposed by appellants. We conclude that the Legislature cannot have intended to impose such a duty, and that such a duty does not necessarily further the legislative purpose of promoting the acquisition of these lifesaving devices.

In the common law, a property owner is found to have a special relationship with patrons or invitees using the property, giving rise to a duty to maintain property in a reasonably safe condition, and in some cases to prevent foreseeable harm by others to patrons or invitees. (*Frances T., supra,* 42 Cal.3d 490; *Delgado, supra,* 36 Cal.4th 224.) In the sports context, an owner or operator of a sports facility has a duty not to unreasonably increase the risk of harm inherent in the sport. (See *Knight v. Jewett, supra,* 3 Cal.4th 296.) And, in cases where a business patron or invitee is being attacked or is experiencing an injury or medical emergency, property owners have a duty to take reasonable steps, such as calling 911, to come to that person's aid. (*Morris, supra,* 36 Cal.4th 260; *Breaux, supra,* 153 Cal.App.3d 379.) In these cases, courts of this state have described the parameters of the legal duty based on the special relationship of a property owner or manager to a patron. Nowhere in the common law have we found authority for imposing a duty on an owner of a sports facility to provide notice to those using the facility of the availability of medical devices in the event that an athlete experiences an injury that is an inherent risk of the sport. As an intermediate appellate court, we are bound to follow and apply prevailing precedent. (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.) Based on our review of such precedent, we cannot find a legal duty in the circumstances here sufficient to support tort liability. We therefore decline to impose such a duty.

## DISPOSITION

The judgment is affirmed.

Duffy, J., concurred.

**McADAMS, J.,** Dissenting.—I respectfully dissent.

This is not a case about the immunity statutes related to the acquisition and use of an automatic external defibrillator (AED). This is not a case about assumption of risk inherent in sports activities. This is not a case about a third party criminal attack or an ill restaurant customer.

This case involves a business entity that invites patrons to use its facilities *for an activity known to have a high risk of injury*—ice hockey—yet fails to have an emergency response plan in place in the event of injury and fails to inform those engaged in or supervising such high-risk activity of an emergency plan or the availability of emergency equipment in the event of injury.

"A possessor of land who holds it open to the public" is under a duty to "members of the public who enter in response to [the possessor's] invitation" to "protect them against unreasonable risk of physical harm, and [¶] . . . to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others." (Rest.2d Torts, § 314A.)

Our Supreme Court has recognized the "special relationship" that exists between business proprietors and their patrons and invitees. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 237 [30 Cal.Rptr.3d 145, 113 P.3d 1159].) This relationship creates a duty to maintain the premises in their possession and control "in a reasonably safe condition." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207].) This general maintenance duty includes the obligation to protect patrons and invitees by taking reasonable steps to prevent foreseeable harm to them (*Delgado v. Trax Bar & Grill,* at p. 237) and by assisting, in some appropriate and reasonable manner, when those using the commercial premises face imminent danger or harm. (*Morris v. De La Torre* (2005) 36 Cal.4th 260 [30 Cal.Rptr.3d 173, 113 P.3d 1182].)

The operative pleadings here (plaintiffs' third amended complaint and various judicially noticed discovery responses)[1] alleged that when the teenage

---

[1] The trial court granted defendants' request for judicial notice of plaintiffs' prior pleadings and certain discovery responses. This is not an issue on appeal.

hockey player suffered cardiac arrest and collapsed on the ice, bystanders called 911 and immediately responded to him, including two adults who were trained and certified in the use of an AED. Plaintiffs alleged that no one was aware of or informed about the existence and placement of an AED acquired by defendants (located just 20 feet away from the fallen boy). Plaintiffs also asserted that defendants "did not respond to the medical emergency or set in motion any medical emergency response." However, there was a call placed to 911 by someone connected to the facility. The complaint further alleged that defendants "engaged in the management and provision of space to be used in athletic events involving a high amount of exertion as well as possible collision and injury," yet they failed to have an emergency plan or provide any information, notice or warning to invitees, participants, officials, et cetera, of such a plan.

Recognizing a duty on the part of the ice hockey rink under the circumstances alleged here is consistent with the principles expressed by the California Supreme Court. On balance, the factors to be considered in analyzing the existence and scope of a duty, as set forth in the landmark case of *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561], weigh heavily in favor of finding a duty under the circumstances here: the high foreseeability of harm and the degree of certainty of injury, the fact that the risk arises from the very activity for which patrons are invited and from which defendants derive a direct commercial benefit (as compared to third party criminal conduct or other extraneous or remote causes), and the minimal burden to such a commercial enterprise in imposing a duty to do nothing more than create and disseminate an emergency plan. The fact that the injury arises during participation in a sports activity should not affect this duty. The sports injury/assumption of risk cases may absolve business proprietors from liability for the *occurrence* of an injury inherent in the sport, but these cases should not immunize facilities or other responsible persons or entities from any responsibility in regards to *rendering aid* to an injured player in an appropriate and reasonable manner.

It should be noted that my analysis places no weight on whether defendant installed an AED or not. I acknowledge there is no duty to acquire and use an AED under Civil Code section 1714.21 and Health and Safety Code section 1797.196. In spite of any argument plaintiffs may have made as to a more limited duty, my analysis focuses on the failure to have an emergency plan or to disseminate information concerning the location and availability of whatever emergency equipment may have been present at the ice rink (whether an AED or any other equipment) in the face of high-risk activity resulting in injury.

Having recognized a duty under these circumstances,[2] I find that plaintiffs' pleadings were sufficient to overcome the demurrer. I would reverse.

Appellants' petition for review by the Supreme Court was denied August 15, 2007, S153997. Kennard, J., was of the opinion that the petition should be granted.

---

[2] The issue of any duty of protection and assistance imposed on those sponsoring or officiating this high-risk activity is not before us.

## APPENDIX

**Civil Code section 1714.21** provides:

"(a) For purposes of this section, the following definitions shall apply:

"(1) 'AED' or 'defibrillator' means an automated or automatic external defibrillator.

"(2) 'CPR' means cardiopulmonary resuscitation.

"(b) Any person who, in good faith and not for compensation, renders emergency care or treatment by the use of an AED at the scene of an emergency is not liable for any civil damages resulting from any acts or omissions in rendering the emergency care.

"(c) A person or entity who provides CPR and AED training to a person who renders emergency care pursuant to subdivision (b) is not liable for any civil damages resulting from any acts or omissions of the person rendering the emergency care.

"(d) A person or entity that acquires an AED for emergency use pursuant to this section is not liable for any civil damages resulting from any acts or omissions in the rendering of the emergency care by use of an AED, if that person or entity has complied with subdivision (b) of Section 1797.196 of the Health and Safety Code.

"(e) A physician who is involved with the placement of an AED and any person or entity responsible for the site where an AED is located is not liable for any civil damages resulting from any acts or omissions of a person who renders emergency care pursuant to subdivision (b), if that physician, person, or entity has complied with all of the requirements of Section 1797.196 of the Health and Safety Code that apply to that physician, person, or entity.

"(f) The protections specified in this section do not apply in the case of personal injury or wrongful death that results from the gross negligence or willful or wanton misconduct of the person who renders emergency care or treatment by the use of an AED.

"(g) Nothing in this section shall relieve a manufacturer, designer, developer, distributor, installer, or supplier of an AED or defibrillator of any liability under any applicable statute or rule of law."

**Health and Safety Code section 1797.196** provided in 2004, at the time of the incident on which this lawsuit is based, as follows:

"(a) For purposes of this section, 'AED' or 'defibrillator' means an automated or automatic external defibrillator.

"(b) In order to ensure public safety, any person or entity that acquires an AED is not liable for any civil damages resulting from any acts or omissions in the rendering of the emergency care under subdivision (b) of Section 1714.21 of the Civil Code, if that person or entity does all of the following:

"(1) Complies with all regulations governing the placement of an AED.

"(2) Ensures all of the following:

"(A) That the AED is maintained and regularly tested according to the operation and maintenance guidelines set forth by the manufacturer, the American Heart Association, and the American Red Cross, and according to any applicable rules and regulations set forth by the governmental authority under the federal Food and Drug Administration and any other applicable state and federal authority.

"(B) That the AED is checked for readiness after each use and at least once every 30 days if the AED has not been used in the preceding 30 days. Records of these checks shall be maintained.

"(C) That any person who renders emergency care or treatment on a person in cardiac arrest by using an AED activates the emergency medical services system as soon as possible, and reports any use of the AED to the licensed physician and to the local EMS agency.

"(D) For every AED unit acquired up to five units, no less than one employee per AED unit shall complete a training course in cardiopulmonary resuscitation and AED use that complies with the regulations adopted by the Emergency Medical Service Authority and the standards of the American Heart Association or the American Red Cross. After the first five AED units are acquired, for each additional five AED units acquired, one employee shall be trained beginning with the first AED unit acquired. Acquirers of AED units shall have trained employees who should be available to respond to an emergency that may involve the use of an AED unit during normal operating hours.

"(E) That there is a written plan that describes the procedures to be followed in the event of an emergency that may involve the use of an AED, to ensure compliance with the requirements of this section. The written plan shall include, but not be limited to, immediate notification of 911 and trained office personnel at the start of AED procedures.

"(3) Building owners ensure that tenants annually receive a brochure, approved as to content and style by the American Heart Association or American Red Cross, which describes the proper use of an AED, and also ensure that similar information is posted next to any installed AED.

"(4) No less than once a year, building owners will notify their tenants as to the location of AED units in the building.

"(c) Any person or entity that supplies an AED shall do all of the following:

"(1) Notify an agent of the local EMS agency of the existence, location, and type of AED acquired.

"(2) Provide to the acquirer of the AED all information governing the use, installation, operation, training, and maintenance of the AED.

"(d) A violation of this provision is not subject to penalties pursuant to Section 1798.206.

"(e) The protections specified in this section do not apply in the case of personal injury or wrongful death that results from the gross negligence or willful or wanton misconduct of the person who renders emergency care or treatment by the use of an AED.

"(f) Nothing in this section or section 1714.21 may be construed to require a building owner or a building manager to acquire and have installed an AED in any building.

"(g) This section shall remain in effect only until January 1, 2008, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2008, deletes or extends that date."

Health and Safety Code section 1797.196 was amended in 2005 to add a subdivision specifically regarding AED's in public or private schools (new subd. (b)(5)), and to make some minor changes in wording. It was again amended in 2006 to extend the sunset date.