Filed 10/26/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MARK DIX, et al.<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC., et al.<br><br>Defendants and Respondents. | B289596<br><br>(Los Angeles County<br>Super. Ct. No. BC628255) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dan Thomas Oki, Judge.  Reversed.

Callahan, Thompson, Sherman & Caudill, Lee A. Sherman, and Randy Hy for Plaintiffs and Appellants.

Daniels, Fine, Israel, Schonbuch & Lebovits, Mark R. Israel, Michael Schonbuch, and Geronimo Perez for Defendants and Respondents.

_____

# INTRODUCTION

While at Live Nation's[1] electronic music festival, Katie Dix ingested an illegal drug and collapsed. After medical personnel responded, an ambulance transported Katie to a hospital, where she died shortly thereafter. Katie's parents, Mark and Pamela Dix, sued Live Nation for negligence and other causes of action. Live Nation moved for summary judgment, arguing that it did not owe a duty of care to music festival attendees.

The trial court granted Live Nation's motion. The Dixes contend that the trial court erred in granting summary judgment because Live Nation owed a duty of care to music festival attendees and that triable issues of material fact exist on their negligence cause of action. Because of its special relationship with festival attendees, an operator of electronic music festivals like Live Nation owes a duty of reasonable care to festival attendees. Whether Live Nation breached its duty and caused Katie's death are for the jury to determine. Therefore, we reverse.

## FACTUAL AND PROCEDURAL HISTORY

### A.     *2015 Hard Fest*

In early 2015 Live Nation selected the Pomona Fairplex as the location for the 2015 Hard Summer Music Festival (Hard Fest). Live Nation scheduled the two-day electronic music festival for August 1, 2015 (12:00 noon to 11:00 p.m.) and August 2, 2015 (12:00 noon to 10 p.m.). Live Nation anticipated

---

[1]     Live Nation Entertainment, Inc., Live Nation Worldwide, Inc., Hard Events, LLC, and Los Angeles County Fairplex Association are collectively referred to as Live Nation.

65,000 attendees each day, the majority of whom would be between ages 18 and 28. According to Live Nation, Hard Fest would feature "a large number of the industry's lead performing Electronic Music DJ's and music artists."

In order to put on Hard Fest, Live Nation needed to obtain government permits and approvals. After Live Nation submitted site plans, a schedule of events, and other information, the Los Angeles County Fire Department issued a public safety permit. The City of Pomona issued a building and safety permit and an electrical permit, allowing Live Nation to erect structures, including in excess of 250 tents. Live Nation contracted with third party vendors to provide perimeter security and main entrance security. The main entrance security vendor provided approximately 400 security personnel.

Live Nation's "Music Festival 2015 Safety Overview" provided, "Patrons make attempts to sneak illegal substances in . . . . Patrons who consume illegal substances are also prone to dehydration or possible overdose reactions. [¶] Some patrons will consume several different substances and suffer from negative effects. [¶] This is the major risk." In addition, "based on its prior knowledge from past electronic music festivals it has held, [Live Nation] anticipated that attendees at [Hard Fest] could" possess, consume, and distribute "illicit drugs" and that attendees "could suffer from a drug overdose." Therefore, according to Live Nation, it "retained security and medical vendors and coordinated with local public agencies to use reasonable measures to implement security and medical plans for the safety of attendees at [Hard Fest]."

As Hard Fest attendees approached the main entrance, they could deposit contraband, including illegal drugs, in

amnesty boxes. Any contraband placed in an amnesty box was not actionable by law enforcement. Live Nation's security plan called for subjecting every attendee to a pat down search, including a search of the attendee's waistline and the inside of his or her shoes. In addition to Live Nation's own team of approximately 20 security personnel, Live Nation's security deployment at Hard Fest included law enforcement representatives and fire department personnel. Live Nation utilized the services of a third party vendor to provide drug- and bomb-sniffing dogs at Hard Fest. Live Nation also maintained that security personnel were instructed to identify and report any impaired attendees. If security personnel saw prohibited items, including illegal drugs, they were instructed "to implement their security protocol." Live Nation established a command center at Hard Fest to coordinate communication among the various governmental agencies and contractors participating in Hard Fest.

Live Nation anticipated temperatures "above 90 degrees" during Hard Fest. Because it knew that Hard Fest attendees could suffer from "physical exhaustion" due to "dancing" and the "hot weather temperatures," Live Nation made free water available. Attendees could also purchase bottled water. Live Nation also provided "misting" stations and other shaded areas that offered protection from the sun. Three of the five performance stages at Hard Fest were air conditioned. Live Nation issued public service announcements informing Hard Fest attendees to stay hydrated and "doing drugs [was] uncool."

Further, because Hard Fest was a "mass gathering" of over 5,000 people, the Los Angeles County Department of Health Services required Live Nation to prepare a "medical action plan."

4

The purpose of the county's requirement for a medical action plan was "[t]o ensure that participants of mass gathering events have access to the appropriate level of care and to minimize the impact of mass gathering events on the local EMS system." After consulting with a medical doctor, Live Nation formulated a medical action plan for Hard Fest. The fire department approved the medical plan. Once the medical plan had been approved, Live Nation was obligated "to abide by that medical plan." Live Nation's medical plan included five medical aid stations, two of which were primary medical centers. The primary medical centers were air conditioned and contained a cooling off area for attendees. Live Nation's medical plan called for the stations to be staffed with medical personnel, including physicians, nurses, and emergency medical technicians. After they were constructed, the fire department inspected the medical stations to determine "that [they were] compliant with the operational aspects of the overall medical plan for [Hard Fest]."

B. *Katie Dix*

Nineteen-year-old Katie arrived at Hard Fest with her friends, Darby Bednarski and Taylor Blair, at approximately 4:00 p.m. on August 1, 2015. After spending between 20 minutes to an hour waiting in line at the main entrance, Katie and her friends entered the venue around 5:00 p.m. After getting some water for their hydration backpack, the three friends spent about an hour at several different stages. At approximately 6:00 p.m. Katie and her friends went to the Pink stage dome area. Shortly thereafter, while outside the dome, Katie separated from Bednarski and Blair for approximately 10 to 15 minutes to greet Katie's high school friends. When Katie reunited with Bednarski and Blair, the three entered the Pink stage dome, which was not

5

crowded. Katie then walked away from Bednarski and Blair to exit the dome and sat down on the ground at the dome's entrance. However, security personnel told Katie she "needed to get up and move." Katie returned to her friends and looked "clammy."

Approximately five to 10 minutes later while taking photos with Bednarski and Blair, Katie's eyes rolled back, and she collapsed. Katie fell to the ground and hit her head. Although Katie was unconscious, Blair thought Katie might be having a small seizure, and Blair turned Katie on her side. Blair and Bednarski ran to security guards standing at the dome entrance and requested help. According to Bednarski, the security guards "walked, not in a hurry" to Katie and carried Katie by her wrists and ankles and put her on the concrete outside the dome.

According to Bednarski, after they put Katie on the ground, the security guards "just sort of waited as if [Katie] was going to wake up." According to Bednarski, the security personnel "didn't really seem like they knew what to do. They kept looking at each other. [Blair and Bednarski] got a little bit aggressive with them to take action." According to Blair, she told the security personnel to call for medical assistance because Katie was "blue" and not breathing.[2] The security guards told Blair and

---

[2]   As part of their opposition to summary judgment, the Dixes submitted excerpts from seven deposition transcripts (Blair, Bednarski, Vanessa Goodrie, Barry Gillies, Debra Martin, Robert Flores, and Cory Meredith). Although the Dixes' counsel had provided a declaration for each deponent attesting that the excerpts were "true and correct cop[ies] of pertinent portions" of the deposition transcripts, the Dixes failed to submit the court reporter's certification pages. As to three of the transcripts (Bednarski, Blair, and Goodrie), Live Nation had submitted

6

Bednarski that "there was nothing" they could do until the medical personnel arrived. Before medical personnel arrived, no one rendered aid to Katie. Blair estimated it took the responding medical team between 15 and 20 minutes to arrive at Katie's location, while according to Bednarski, "[i]t seemed like it took a very long time" to arrive, "[i]t could have been five minutes though." After initially being unable to locate Katie, the medical

portions of the same deposition transcripts with certification pages. Further, at the hearing on February 27, 2018, the Dixes' counsel stated, "I have all the signed transcripts with me today, including the signed certification pages." However, the trial court sustained Live Nation's objections to the Dixes' deposition excerpts because they were not certified. The trial court refused to consider the deposition excerpts. Under either a de novo or abuse of discretion standard, the trial court improperly excluded the deposition transcript excerpts. (See *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1527 [trial court abused its discretion in sustaining authenticity and foundation objections to deposition excerpts because objecting party "admitted the authenticity" by using portions of the same transcript in support of summary judgment motion and attorney's declaration was "sufficient" to authenticate the excerpts]; see generally *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 368 ["[c]ourts are split regarding the proper standard of review for the trial court's evidentiary rulings in connection with motions for summary judgment and summary adjudication"]; *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226 ["[t]he weight of authority . . . holds that an appellate court applies an abuse of discretion standard" to evidentiary issues arising in the context of a summary judgment motion, except evidentiary rulings turning on questions of law, such as hearsay rulings, which are reviewed de novo].)

team, upon arrival, placed a manual air pump in Katie's mouth and began performing CPR. About 15 minutes later, the medical team transported Katie by cart to an ambulance.

While waiting to depart for the hospital, Bednarski sat in the front of the ambulance while medics tended to Katie in the back. Bednarski heard the medics performing CPR on Katie, as well as the "thuds of the paddles." According to Bednarski, they were in the ambulance for a long period of time before it left for the hospital. During this delay, "the thud and the charging stopped, and there was pretty casual talking." Bednarski heard a supervisor yell at the medical crew that was attending Katie, "'Why did you stop resuscitating? You never stop resuscitating. You could have just killed this girl.'"

At the hospital an emergency room doctor pronounced Katie dead at 8:10 p.m. The medical examiner determined that the cause of Katie's death was acute drug intoxication. Katie's blood tested positive for 3,4-methylenedioxy-methamphetamine (MDMA), commonly referred to as Ecstasy, and Ethylone, commonly known as bath salt.

C.    *The Dixes File This Action*

Katie's parents filed a second amended complaint (complaint) on August 16, 2017, alleging five causes of action. The Dixes alleged causes of action for negligence, premises liability, public nuisance, wrongful death, and survival. The complaint alleged that Ecstasy is a commonly ingested illegal drug at electronic music festivals, such as Hard Fest; that Live Nation had constructive and actual knowledge that Ecstasy would be sold, distributed and consumed at Hard Fest; and that, particularly when "temperatures topped 90 degrees," Ecstasy created a risk of serious injury or death from severe dehydration,

8

heatstroke and other cardiovascular risks." The complaint further alleged, "[a]fter being admitted into Hard Fest, [Katie] consumed what she thought was pure [Ecstasy], which was obtained from an unknown source at [Hard Fest] where the unlawful sale of drugs and/or controlled substances was rampant."

The Dixes further alleged that Katie, after demonstrating "common signs of dehydration and/or drug overdose," became "unresponsive and collapsed, sustaining a contusion to her head." The complaint alleged that "the overcrowded and understaffed conditions at Hard Fest delayed the response of onsite security and emergency medical service providers by approximately 30 minutes." "During this delayed response, [Katie's] condition worsened, and she went into full cardiac arrest." The complaint further alleged that "the on-site security and emergency medical services providers that did ultimately respond to [Katie] were also inadequately trained and equipped." As a result, Live Nation was "unable to provide the immediate, necessary and urgent emergency medical care and treatment that [Katie] required while still at Hard Fest." The complaint further alleged, had there been "timely and proper medical treatment" at Hard Fest, Katie "could have been saved."

In their negligence cause of action, the Dixes alleged that Live Nation owed a duty to Hard Fest attendees, including Katie, "to provide facilities, security and emergency medical services personnel sufficient to maintain order and safety at the Hard Fest." Despite knowledge that there would be "widespread illegal and illicit [drug] activity," Live Nation negligently and recklessly failed to staff Hard Fest with enough adequately trained and equipped private security personnel "to maintain order and

9

deter" the distribution and consumption of illegal drugs.  The Dixes further alleged that Live Nation failed to staff Hard Fest with sufficient qualified emergency medical service providers to deal adequately with the foreseeable numbers of attendees "likely to, and [who] did, experience adverse reactions to the illegal drugs consumed in the overcrowded event."  The Dixes also alleged that Live Nation breached its duties by failing to "provide the attendees with ready access to a sufficient supply of drinking water to reduce the likelihood of [Ecstasy-related] dehydration among attendees."

D.    *Live Nation's Motion for Summary Judgment*

1.    *Moving Papers*

In its motion for summary judgment,[3] Live Nation argued that it was entitled to judgment because the Dixes "cannot establish as a matter of law that [Live Nation] owed a duty to ensure Katie's safety against her own volitional choice to engage in dangerous, prohibited activities during the Hard Fest."  Live Nation argued that, based on the application of the factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), "[w]hile [Katie's] death is tragic, these facts do not create a duty on the part of [Live Nation] to prevent her from voluntarily ingesting a known illegal drug, or for [Live Nation] to ensure

---

[3]    Live Nation filed two nearly identical motions for summary judgment, one on behalf of Live Nation Worldwide, Inc. and Hard Events, LLC, and the other on behalf of Live Nation Entertainment, Inc. and the Los Angeles County Fair Association.  Because the parties and trial court treated the two motions as "identical," we do as well.

10

[Katie] consumed adequate water and hydration to avoid injury or death from overdose."

Live Nation contended that, "[g]iven the tenuous, if any, connection between any acts by Live Nation and [Katie's] voluntary, ill-advised decision to proactively seek out and consume [E]cstasy, and in light of the profuse evidence reflecting the painstaking efforts taken by [Live Nation] to ameliorate the effects of any self-destructive acts or neglect by attendees, even if [Live Nation] owed some hypothetical duty to [Katie], the Dixes cannot prove [Live Nation] breached such hypothetical duty."

Live Nation pointed out that Hard Fest was "a structured event, professionally planned, and subject to governmental oversight with cooperation from the county fire department, local law enforcement, and the surrounding communities." Live Nation argued that the undisputed facts demonstrated that "the safety of its attendees[ ] was safeguarded through comprehensive security measures enacted after collaboration and consultation with the [fire department], local law enforcement, and security vendors and contractors hired by Live Nation." Live Nation also argued that "[s]ecurity professionals seeded throughout [Hard Fest] . . . were instructed to observe and report . . . impaired individuals . . . so the medical team could respond." Live Nation contended that it "provided over 160 free watering valves spread across several watering stations for attendees to utilize."

Finally, although it did not submit any expert witness testimony, Live Nation argued that, even if a duty existed, "[the Dixes] cannot demonstrate that any act of [Live Nation] was a substantial factor in causing [Katie's] death from [E]cstasy overdose." Live Nation contended that "no connection exists,

11

direct or indirect, between any act or omission on part of [Live Nation] and [Katie's] unfortunate overdose."

### 2. *The Dixes' Opposition*

In opposition to Live Nation's motion, the Dixes contended that "[Live Nation] had a duty to exercise reasonable, ordinary care in providing a *safe* environment for [Katie] and other attendees (business invites[*sic*]) [at Hard Fest]"  According to the Dixes, "it [was] reasonably foreseeable that *numerous kids*, including Katie would take drugs [at Hard Fest] . . . suffer from a drug overdose, dehydration, and/or physical exhaustion, and if not tended to properly and timely, die."  Based on that knowledge, the Dixes argued that Live Nation's duties included: "to provide an adequate number of properly trained and equipped medical services sufficient to maintain safety; to properly train its security to handle incidents such as this one, especially given its knowledge that attendees would likely possess, distribute and/or consume illegal drugs and experience severe adverse reactions from illegal drugs; to ensure that proper timely medical care would be provided to its attendees under the circumstances; to maintain adequate medical facilities for the attendees during the event; [and] to act reasonable under the circumstances once medical assistance has begun."

The Dixes further argued that disputed issues of fact existed regarding whether Live Nation breached these duties. The Dixes submitted evidence indicating that Live Nation did not enforce its security protocols because it failed to train the security personnel to follow the protocols.  The Dixes argued that "there [were] questions of fact as to how staff actually *executed*" Live Nation's "comprehensive security protocol."  The Dixes further

12

argued that the evidence showed that there were "insufficient water stations for the number of attendees."

In addition, according to the Dixes, triable issues of fact existed because the evidence showed that Live Nation negligently responded to Katie's emergency and failed to provide her proper and timely medical care. The Dixes submitted a declaration from a physician board-certified in emergency medicine and medical toxicology. The physician opined that, "had advanced medical care been readily available at [Hard Fest], [Katie] to a reasonable medical probability would have survived the drug ingestion. . . . Only advanced medical treatment consisting of advanced airway skills in conjunction with supplemental oxygen to breath[e] for the patient and the use of an automatic defibrillator in a timely fashion could have prevented her death. Given the prolonged delay in the arrival of advanced medical care, Katie had no hope of survival."

E. *The Trial Court's Rulings and Judgment*

In its written ruling the trial court granted Live Nation's motion for summary judgment. The trial court stated that *Rowland*, *supra*, 69 Cal.2d 108 set forth the "factors to consider in determining whether a duty" existed under a negligence cause of action. The trial court ruled that a review of the facts of this case applied to the *Rowland* factors demonstrated that Live Nation did not owe a duty to Katie. While stating that it was foreseeable Katie would be harmed and that the degree of certainty that Katie suffered injury was "absolute," the trial court ruled that Katie's death "was not closely causally connected to [Live Nation's] conduct in promoting and producing Hard Fest." Moreover, neither *Rowland*'s moral blame factor nor the public policy of preventing future harm weighed in favor of imposing a

13

duty on Live Nation. That Live Nation did not encourage or plan attendees' drug use but rather took "numerous steps to discourage and prevent drug use," showed that the "policy of preventing future harm [was] not strong."

The trial court characterized the Dixes' contention that Live Nation "had a duty to exercise reasonable care in providing medical services once care had begun," as a "claim that [Live Nation] had a legal duty based upon nonfeasance, i.e., that there was a special relationship that created a duty to act." The trial court pointed out that the Dixes "do not appear to have alleged this in their [complaint]; as such, it is disregarded. The [Dixes] do not, moreover, explain how or why [Live Nation] would be liable to them for any alleged breach in the standard of care by third-party medical providers." The trial court did not rule on breach of duty or causation.

The trial court entered judgment in favor of Live Nation on March 7, 2018. The Dixes timely appealed.

## DISCUSSION

### A. *Standards of Review*

"We review a grant of summary judgment . . . de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party or a determination a cause of action has no merit as a matter of law." (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1179 (*Husman*).) In general the standard of review applicable to summary judgment rulings is "that any doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.) "'We liberally construe

14

the opposing party's evidence and resolve all doubts in favor of the opposing party. [Citation.] We consider all evidence in the moving and opposition papers, except that to which objections were properly sustained.'" (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; see also *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 957 ["[i]n determining whether a triable issue was raised or dispelled, we must disregard any evidence to which a sound objection was made in the trial court, but must consider any evidence to which no objection, or an unsound objection, was made"].) "'[S]ummary judgment cannot be granted when the facts are susceptible to more than one reasonable inference . . . .'" (*Husman*, at p. 1180.)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 (*Aguilar*); *Husman, supra,* 12 Cal.App.5th at pp. 1179-1180.) "'If a plaintiff pleads several theories, the defendant has the burden of demonstrating there are no material facts requiring trial on any of them.'" (*Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1228.)

If a defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 850; *Husman, supra,* 12 Cal.App.5th at pp. 1179-1180.) Where the evidence presented by defendant does not meet its burden, "the motion must be denied without looking at the opposing evidence, if any, submitted by plaintiff." (*Duckett v. Pistoresi Ambulance Service, Inc.* (1993) 19

15

Cal.App.4th 1525, 1533.)  Accordingly, plaintiff has no evidentiary burden on summary judgment unless and until the moving defendant first meets its initial burden.  (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 840.)

> B.  *The Trial Court Erred When It Concluded that Live Nation Did Not Owe a Duty to Katie*
>
> 1.  *Applicable Law*

"A plaintiff in any negligence suit must demonstrate "'a legal duty to use due care, a breach of such legal duty, and [that] the breach [is] the proximate or legal cause of the resulting injury.'"" (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1142 (*Kesner*).)  "Duty is a question of law for the court, to be reviewed de novo on appeal." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 (*Cabral*).)  "California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others.  (Civ. Code, § 1714, subd. (a).)" (*Cabral,* at p. 768.)  Civil Code section 1714, subdivision (a), provides in relevant part:  "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

Although there is no duty to come to the aid of another (*Williams v. State of California* (1983) 34 Cal.3d 18, 23), "a duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*); see *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129 (*Zelig*) [duty

to assist or protect may arise if "a special relation exists between the actor and the other which gives the other a right to protection"]; *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 789 (*Lopez*) ["some relationships by their very nature are 'special' ones giving rise to an 'initial duty' to come to the aid of others, regardless of whether there has been detrimental reliance in a particular case"]; *Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307, 325 (*Rotolo*) ["[a] defendant who is found to have a 'special relationship' with another may owe an affirmative duty to protect the other person from foreseeable harm, or to come to the aid of another in the face of ongoing harm or medical emergency"], disapproved on another ground in *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 328-329, 344, fn. 15 (*Verdugo*).) """This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter.""" (*Zelig*, at p. 1129.)

"Relationships that have been recognized as 'special' share a few common features. Generally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." (*Regents*, *supra*, 4 Cal.5th at p. 620.) The Supreme Court in *Regents* explained, "The corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection. '[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare."'" (*Id.* at p. 621.)

Relying on the Third Restatement of Torts, the Court in *Regents* held "a business or landowner with invited guests" is a special relationship "that may support a duty to protect against

17

foreseeable risks." (*Id.* at p. 620.) In *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224 (*Delgado*) the Court stated, "Courts have found such a special relationship in cases involving the relationship between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees." (*Id.* at p. 235; see *Lopez, supra,* 40 Cal.3d at p. 789 ["[t]he relationship between a common carrier and its passengers is just such a special relationship, as is the relationship between an innkeeper and his or her guests, between a possessor of land and those who enter in response to the landowner's invitation and between a psychiatrist and his or her patients"]; *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 (*Peterson*) ["[a]mong the commonly recognized special relationships are that between a possessor of land and members of the public who enter in response to the landowner's invitation"]; *University of Southern California v. Superior Court* (2018) 30 Cal.App.5th 429, 444 ["[t]he relationship between a possessor of land and an invitee is a special relationship giving rise to a duty of care"]; *Rotolo, supra,* 151 Cal.App.4th at p. 326 ["[c]ourts have found that a '"special relationship"' exists between business proprietors and their patrons or invitees . . ."]; see also *Morris v. De La Torre* (2005) 36 Cal.4th 260, 274 ["[i]t is well established that a proprietor's special-relationship-based duty to customers or invitees extends beyond the structure of a premises to areas within the proprietor's control"].)[4]

---

[4] The Supreme Court in *Lopez, supra,* 40 Cal.3d 780 explained a bus carrier has a special relationship with its passengers because "bus passengers are 'sealed in a moving steel cocoon.' Large numbers of strangers are forced into very close

18

In *Verdugo, supra,* 59 Cal.4th 312 the Supreme Court held that a department store's common law duty of reasonable care to its customers did not include an obligation to acquire and make available an automated external defibrillator (AED) for use in a medical emergency. (*Id.* at pp. 336-337.) In analyzing the duty issue, the Court noted, "There have been a few California Court of Appeal cases that directly involved the question of a business's common law duty to provide first aid or medical assistance to a patron who is injured or becomes ill on the business's premises." (*Id.* at p. 337.) However, the Court pointed out that "all of the most analogous California common law cases that have reached this court have involved the distinct but related question whether a business has a common law duty to take steps to protect its patrons from criminal activity of third persons that endangers such patrons on its premises." (*Ibid.*) The Court stated that, in both situations, "the legal duty to the patron arises from the relationship between the parties and exists even though a business has not itself caused the injury or illness in question." (*Ibid.*)

In considering the scope of the department store's duty to protect the health of its patrons and applying the analysis from prior cases involving a business owner's duty to protect patrons against potential third party criminal conduct, the Court stated,

physical contact with one another under conditions that often are crowded, noisy, and overheated. At the same time, the means of entering and exiting the bus are limited and under the exclusive control of the bus driver. Thus, passengers have no control over who is admitted on the bus and, if trouble arises, are wholly dependent upon the bus driver to summon help or provide a means of escape." (*Id.* at p. 789.)

"when the precautionary medical safety measures that a plaintiff contends a business should have provided are costly or burdensome rather than minimal, the common law does not impose a duty on a business to provide such safety measures in the absence of a showing of a heightened or high degree of foreseeability of the medical risk in question." (*Verdugo, supra,* 59 Cal.4th at p. 339; cf. *Delgado, supra,* 36 Cal.4th at p. 245 ["[h]eightened foreseeability is satisfied by a showing of prior *similar* criminal incidents (or other indications of a reasonably foreseeable risk of violent criminal assaults in that location) and does not require a showing of prior *nearly identical* criminal incidents"].) Finding that the burden in acquiring and providing an AED at a department store would be "considerably more than a minor or minimal burden" and that "the risk of [sudden cardiac arrest] is no greater at [a department store] than at any other location open to the public," the Court held that the department store did not owe a duty to its customers to acquire and make available an AED. (*Verdugo,* at p. 340.)[5]

---

[5] Again, drawing from third party criminal conduct cases, the Court held, "In considering the scope of a business's common law duty to take reasonable steps to protect the health of its patrons while the patrons are on the business's premises, we draw a comparable distinction between (1) a business's common law duty *to take precautionary steps prior to the time such an injury or illness has occurred* in light of the foreseeability that such an injury or illness may occur, and (2) a business's common law duty to act to assist a patron from an ongoing threat to the patron's health and safety *after the patron has experienced an injury or illness on the business's premises*." (*Verdugo, supra,* 59 Cal.4th at p. 338.)

### 2.     *Live Nation Owed a Duty of Care*

Live Nation, as the operator of an electronic music festival, had a special relationship with its 65,000 festival invitees.  Once they passed through security and entered the large enclosed grounds for the 11-hour festival, the festival attendees were dependent on Live Nation.  In the event of a medical emergency, Live Nation controlled not only if and when attendees would receive medical care, but also the nature and extent of the care.  Attendees could not summon their own medical care.  Attendees also depended on Live Nation to provide adequate security.

Based on its prior experience with producing similar festivals, Live Nation knew that a "major risk" of conducting an electronic music festival was that attendees would "consume illegal substances" and suffer "negative effects," including "overdose[s]."  Recognizing the "high degree" of foreseeability of illegal drug use and medical emergencies, Live Nation "retained security and medical vendors and coordinated with local public agencies to use reasonable measures to implement security and medical plans for the safety of attendees."  Rather than arguing the burdens were too high, Live Nation assumed the burdens of detecting unlawful drugs and providing medical care to attendees.  Under these circumstances, because of the special relationship between Live Nation and Hard Fest attendees, Live Nation owed a duty of reasonable care to Katie and the other Hard Fest attendees.  (See *Delgado, supra*, 36 Cal.4th at p. 237 ["foreseeability is a 'crucial factor' in determining the existence and scope of a legal duty"]; *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 ["[t]he most important of these considerations in establishing a duty is foreseeability"].)

21

Live Nation's argument that it did not owe Katie a duty because she voluntarily consumed an illegal drug and died from acute drug intoxication may be relevant to causation or comparative fault, but not duty. Live Nation is essentially arguing a comparative fault issue under the duty rubric. California has "abandoned the time-worn contributory negligence rule which completely exonerated a negligent defendant whenever an injured plaintiff was partially at fault for the accident . . . ." (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 607.) Under California's "pure" comparative fault doctrine, the trier of fact "assign[s] responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties" and "the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering." (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 828-829 (*Li*); see *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 284 ["if the decedent had been comparatively negligent, a wrongful death judgment will be reduced proportionately"]; see generally *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1285 ["The comparative fault doctrine 'is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine "is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury . . . in order to arrive at an 'equitable apportionment or allocation of loss.'"'"].)[6] Given the special

---

[6] After noting that Civil Code section 1714 "has shown great adaptability" providing ample room for "judicial development of important new systems of rules," the Supreme Court in *Li*, *supra*,

22

relationship between Live Nation and Katie and Live Nation's duty of care, Katie's alleged culpability does not eliminate or diminish Live Nation's duty. (See *Kesner*, *supra*, 1 Cal.5th at p. 1157 ["It must be remembered that a finding of duty is not a finding of liability. To obtain a judgment, a plaintiff must prove that the defendant breached its duty of ordinary care and that the breach proximately caused the plaintiff's injury, and the defendant may assert defenses and submit contrary evidence on each of these elements"].)[7]

### 3. *Rowland Factors*

""""Courts . . . invoke[ ] the concept of duty to limit generally 'the otherwise potentially infinite liability which would follow from every negligent act . . . .""""" (*Kesner*, *supra*, 1 Cal.5th at p. 1143; accord, *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397.) "The conclusion that a defendant did not have a duty constitutes a determination by the court that public policy

---

13 Cal.3d at p. 816 held that section 1714's language, "except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself [or herself]," did not preclude the establishment of comparative fault. (Italics omitted.) The Court held the section 1714's "defensive" language should not be construed so as to stifle the orderly evolution of such considerations in light of emerging techniques and concepts." (*Li*, at p. 822.)

[7] The Court in *Cabral*, *supra*, 51 Cal.4th 764 rejected the argument that the defendant owed "no duty" because the plaintiff was injured "only as a result of his own negligence." (*Id*. at p. 781.) However, in *Cabral*, the jury found that plaintiff's negligence was a cause of the accident and assigned plaintiff 90 percent of the comparative fault. (*Ibid*.)

concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result." (*Kesner*, at p. 1143.) "'The history of the concept of duty in itself discloses that it is not an old and deep-rooted doctrine but a legal device of the latter half of the nineteenth century designed to curtail the feared propensities of juries toward liberal awards.'" (*Ibid.*; accord, *Dillon v. Legg* (1968) 68 Cal.2d 728, 734.) "The court may depart from the general rule of duty, however, if other policy considerations clearly require an exception." (*Regents, supra*, 4 Cal.5th at p. 628; accord, *Kesner, supra,* 1 Cal.5th at p. 1143; *Rowland, supra,* 69 Cal.2d at p. 112.)

When determining whether policy considerations weigh in favor of an exception to a duty of care, the Court in *Rowland* held that the most important factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland, supra*, 69 Cal.2d at p. 113.)

Because a duty is premised on the special relationship between operators of an electronic music festival and festival attendees and Civil Code section 1714's general duty to exercise ordinary care in one's activities, which includes the conduct of an electronic music festival, we rely on the *Rowland* factors not to determine "whether a *new duty* should be created, but whether

24

an *exception* . . . should be created." (*Cabral, supra,* 51 Cal.4th at p. 783; accord, *Regents, supra,* 4 Cal.5th at p. 628 [where a special relationship has been identified, the Court applied the *Rowland* factors to determine whether they "justified excusing or limiting a defendant's duty of care"]; *Soto v. Union Pacific Railroad Co.* (2020) 45 Cal.App.5th 168, 181, fn. 7 ["the *Rowland* factors . . . apply when a statutory duty of care is found to exist and the question presented is whether public policy supports a departure from that general duty of care"]; see also *University of Southern California v. Superior Court, supra,* 30 Cal.App.5th at p. 452 ["some courts have considered the *Rowland* factors despite concluding that there was no special relationship and no duty, with the *Rowland* analysis supporting the conclusion of no duty"].)[8]  We conclude that use of illicit drugs and risk of overdoses at electronic music festivals and the need for immediate and adequate medical care are foreseeable occurrences, and public policy considerations do not justify precluding an injured festival attendee's claims against the festival operator.

Because a judicial decision on the issue of duty entails line-drawing based on policy considerations, "the *Rowland* factors are evaluated at a relatively broad level of factual generality. . . .  [¶] In applying the . . . *Rowland* factors, . . . we have asked not

---

[8]     Courts have also applied the *Rowland* factors in determining whether a business owner owed a duty to an invitee. (See e.g., *Delgado, supra,* 36 Cal.4th at pp. 245-246 ["[t]he remaining *Rowland* factors similarly support a determination that defendant had a special-relationship-based duty to respond to the unfolding events by taking reasonable, relatively simple, and minimally burdensome steps in order to address the imminent danger that [defendant] perceived"].)

whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy. . . . [¶] By making exceptions to Civil Code section 1714's general duty of ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, we preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make." (*Cabral*, *supra*, 51 Cal.4th at p. 772; accord, *Kesner*, *supra*, 1 Cal.5th at p. 1144.)

"The *Rowland* factors fall into two categories. The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability. The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief." (*Regents*, *supra*, 4 Cal.5th at p. 629; accord, *Kesner*, *supra*, 1 Cal.5th at p. 1145.)

a. *Foreseeability factors*

"'The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care . . . is whether the injury in question was *foreseeable*.' [Citations.] In examining foreseeability, 'the court's task . . . "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to

26

result in the kind of harm experienced that liability may appropriately be imposed. . . .""" (*Regents*, *supra*, 4 Cal.5th at p. 629; accord, *Kesner*, *supra*, 1 Cal.5th at p. 1145.) Prior similar incidents are relevant in analyzing foreseeability. (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 537-538.)

"For purposes of duty analysis, "'foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.". . . [I]t is settled that what is required to be foreseeable is the general character of the event or harm–e.g., being struck by a car while standing in a phone booth–not its precise nature or manner of occurrence."' (*Kesner*, *supra*, 1 Cal.5th at p. 1145; accord, *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57-58.)

Here, a reasonably thoughtful electronic music festival operator would consider the likelihood that illegal drugs would be distributed and consumed at the festival and that drug overdoses would occur. Live Nation knew from prior electronic music festivals that attendees at Hard Fest would possess, distribute, and consume "illicit drugs." In its "Safety Overview" for Hard Fest, Live Nation recognized that "possible overdose reactions" from "illegal substances" was a "major risk" to Hard Fest attendees. Because of these concerns and others, Live Nation took steps to prevent illicit drug use at Hard Fest and to provide attendees with medical care. Live Nation acknowledged the foreseeability of the harm by taking steps to detect drugs and providing medical care at Hard Fest. The foreseeability of serious injury or death to electronic music festival attendees from a festival operator's negligence seems certain.

27

"The second factor, 'the degree of *certainty* that the plaintiff suffered injury' [citation], may come into play when the plaintiff's claim involves intangible harm, such as emotional distress. [Citation.] Here, however, we are addressing claims for physical injuries that are capable of identification." (*Regents*, *supra*, 4 Cal.5th at p. 630.) The Dixes alleged that Live Nation's negligence contributed to Katie's death; "their injuries are certain and compensable under the law." (*Kesner*, *supra*, 1 Cal.5th at p. 1148.)

"The third factor is 'the *closeness of the connection* between the defendant's conduct and the injury suffered.' [Citation.] 'Generally speaking, where the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable. Conversely, a closely connected type of injury is likely to be deemed foreseeable.'" (*Regents*, *supra*, 4 Cal.5th at pp. 630-631.)

Here, Katie voluntarily consumed an illegal drug, and someone, likely a Hard Fest attendee, supplied it. There was relevant intervening conduct, but all of the conduct, including Katie's illegal drug consumption and overdose, was entirely foreseeable at an electronic music festival. An attendee's severe injury or death from a drug overdose was a risk created, in part, by an electronic music festival operator's negligence in failing to provide adequate security and appropriate medical care. The injury was closely connected to Live Nation's alleged negligent conduct. (*Kesner*, *supra*, 1 Cal.5th at p. 1148 ["the touchstone of the analysis is the foreseeability of that intervening conduct"].)

The foreseeability factors weigh against finding an exception to the legal duty of ordinary care for operators of electronic music festivals.

### b.     *Policy factors*

"'A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.'" (*Regents*, *supra*, 4 Cal.5th at p. 631; accord, *Kesner*, *supra*, 1 Cal.5th at pp. 1150-1152.)  Although *Rowland*'s foreseeability factors weigh against recognizing an exception, "we must also consider whether public policy requires a different result." (*Regents*, at p. 631.)

The Supreme Court has held that "[w]e have previously assigned moral blame, and we have relied in part on that blame in finding a duty, in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue." (*Kesner*, *supra*, 1 Cal.5th at p. 1151; see *Regents*, *supra*, 4 Cal.5th at p. 632 ["[s]ome measure of *moral blame* does attach to a university's negligent failure to prevent violence against its students"]; *Peterson*, *supra*, 36 Cal.3d at p. 814 [failures to implement "protective measures" to reduce risk of assault at school campus parking lot "indicate that there is moral blame attached to the [community college's] failure[s] to take steps to avert the foreseeable harm"].)

Here, music festival operators, such as Live Nation, benefit financially from the festivals.  Moreover, at electronic music festivals, given their vast scale and perimeter security, attendees are dependent on the operator to provide a safe environment and

29

adequate medical care in the event of an emergency. An attendee cannot obtain medical care on his or her own. Compared to the operator of the music festival, attendees are relatively powerless or unsophisticated. Some moral blame attaches to a music festival operator's negligent failure to prevent foreseeable harm to attendees. This factor weighs against creating an exception to a duty of ordinary care.

"The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible. The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability." (*Cabral*, *supra*, 51 Cal.4th at pp. 781-782.) Here, Live Nation has not identified any undesirable consequences of allowing potential liability. Moreover, Live Nation recognized the need for adequate security and medical care at Hard Fest. Further, because Hard Fest was a "mass gathering" of over 5,000 people, the county required the approval and implementation of a medical action plan to "ensure" that attendees "have access to the appropriate level of care." After inspection, the fire department approved Live Nation's medical plan and issued Live Nation a public safety permit. Public policy supports adequate security and medical care at electronic music festivals. This factor also weighs against creating a duty exception for the operation of electronic music festivals.

As for the burden that a tort duty would impose on the defendant and the community (see *Kesner*, *supra*, 1 Cal.5th at p. 1153; *Rowland*, *supra*, 69 Cal.2d at p. 113), Live Nation has already recognized the risks and undertaken the burden to

provide security measures and medical care at its electronic music festivals. Under these circumstances, there is no reason to create an exception to the duty to exercise reasonable care in one's activities.

The final policy factor in a duty analysis is the availability of insurance for the risks involved. (*Regents*, *supra*, 4 Cal.5th at p. 633; *Rowland*, *supra*, 69 Cal.2d at p. 113.) Live Nation has "offered no reason to doubt" an electronic music festival operator's ability to obtain insurance coverage for the conduct of an electronic music festival. (See *Regents*, at p. 633.)

Live Nation's reliance on *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398 (*Sakiyama*) is misplaced.[9] In *Sakiyama,* after leaving an all-night "rave" party held at defendant's roller skating rink, two teenagers were killed and another two were severely injured in a single car accident. The accident occurred over an hour after the teenagers left the party and about 30 miles away from the skating rink. (*Id.* at p. 403.) Although the skating rink owner "took numerous steps to confiscate and remove both drugs and drug paraphernalia from the facility," one of the teenagers purchased Ecstasy at the party and at least three of the teenagers took the drug. (*Ibid.*) Recognizing that "preventing vehicle accidents which result from drug use and/or fatigue [was] an important goal," the court in *Sakiyama* held that the skating rink owner "had no duty to prevent [attendees] from driving whenever they chose to leave,

---

[9] At the hearing on Live Nation's motion for summary judgment, the trial court stated, "The bottom line, in my mind, right or wrong, is I believe *Sakiyama* [was] controlling in this instance. It's certainly not going to hurt my feelings if the Court of Appeal disagrees with me."

31

even if they were too fatigued or impaired to do so safely." (*Id.* at pp. 410, 412.)

Even assuming the skating rink owner knew drugs would be used during the all-night party, the court further held the owner "that leases its facility for a one-night event does not owe a duty of care to a person injured hours later at a remote location as a result of voluntary drug use and/or fatigue." (*Sakiyama, supra*, 110 Cal.App.4th at p. 406.) The court held that its conclusion of no duty was "consistent with social host liability decisions which have held that defendants who simply provide venues for drinking alcohol do not owe a duty of care to plaintiffs injured by guests who drive from the facilities while intoxicated." (*Id.* at p. 412.)

In reaching its holding, the court in *Sakiyama* distinguished *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40 (*Weirum*). In *Weirum* a radio station with "an extensive teenage audience" held a contest for listeners to locate a radio disc jockey who was driving around Los Angeles. While attempting to locate the peripatetic disc jockey, teenagers negligently caused the death of a third party driver in another vehicle. (*Id.* at p. 43.) The Court held that the radio station owed a duty to the decedent driver because "it was foreseeable" that the youthful radio listeners "in their haste would disregard the demands of highway safety." (*Id.* at p. 47.) Because the intervening conduct, "reckless conduct by youthful contestants," was foreseeable, the Court held "[i]t [was] of no consequence that the harm to decedent was inflicted by third parties acting negligently." (*Ibid.*) According to the court in *Sakiyama*, the radio station in *Weirum* "had ongoing direct involvement in the act that caused the accident and injuries," while the skating rink owner "had no such direct link to

32

the unfortunate accident in this case." (*Sakiyama, supra*, 110 Cal.App.4th at p. 408.)

Here, in contrast to *Sakiyama* where the accident occurred after the event ended and 30 miles away, all conduct at issue occurred wholly within the grounds that Live Nation exclusively controlled. Knowing that overdoses could result from the consumption of illegal drugs, Live Nation invited 65,000 attendees to an 11-hour event inside large secured grounds. Live Nation assumed responsibility to provide security and medical care. In the event of an overdose or other medical emergency, an attendee was dependent on Live Nation to provide appropriate medical care. As in *Weirum, supra*, 15 Cal.3d 40, Live Nation thus had "ongoing direct involvement" in the unfortunate accident. Further, Live Nation's position as an operator of an 11-hour music festival with 65,000 attendees was far from what could be considered a "social host."

### C. *Breach of Duty and Causation Present Triable Issues of Material Fact*

The Dixes argue that triable issues of material fact exist regarding the breach of duty and causation elements of their negligence cause of action. We agree.

#### 1. *Triable Issues of Fact Preclude Summary Judgment Regarding Breach of Duty*

Even assuming that Live Nation carried its initial burden on summary judgment to show that breach of duty "cannot be established" and the burden shifted to the Dixes (Code Civ. Proc., § 437c, subd. (p)(2)), the Dixes set forth specific facts showing that triable issues of material fact existed regarding whether Live Nation breached its duty of care. (*Ibid.*; see *Aguilar*,

33

*supra*, 25 Cal.4th at p. 850.) The Dixes submitted evidence that Live Nation did not adhere to its planned "extraordinary" security procedures at Hard Fest. For example, the Dixes submitted the deposition testimony of Robert Flores, a security supervisor at Hard Fest, who responded to Katie's emergency. Contrary to Live Nation's security plan, Flores testified that he was not instructed to identify impaired attendees at Hard Fest; that he was not advised of a procedure for dealing with attendees suspected to be under the influence of drugs; that he was not provided any information about what action to take if confronted with a medical emergency; and that he was not informed of any items that were prohibited at Hard Fest.

The Dixes also presented evidence from which a reasonable jury could infer that Katie obtained the drug she ingested at Hard Fest. Further, the Dixes submitted admissible evidence that Live Nation negligently responded to Katie's emergency. Accordingly, triable issues of fact exist regarding whether Live Nation breached its duty to Katie. (*Sharufa v. Festival Fun Parks, LLC* (2020) 49 Cal.App.5th 493, 497 [to determine whether a "defendant is entitled to summary [judgment] . . . .we review the entire record and ask whether a reasonable trier of fact could find in plaintiff's favor"]; *Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1474 ["if any evidence or inference therefrom shows or implies the existence of the required element(s) of a cause of action, the court must deny a defendant's motion for summary judgment . . . because a reasonable trier of fact could find for the plaintiff"]; see also *McHenry v. Asylum Entertainment Delaware, LLC* (2020) 46 Cal.App.5th 469, 479, review granted July 15, 2020, S262297 [a triable issue of material fact exists if "'the evidence would allow a

34

reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof"].)

> ### 2. *Live Nation Did Not Meet Its Initial Burden of Showing the Dixes Did Not Have Sufficient Evidence of Causation*

Live Nation argues that the "proximate cause of [Katie's] death was her decision to consume an illegal drug." However, Live Nation did not support this argument with citation to any legal authority. Live Nation therefore forfeited the argument. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["[i]f a party's briefs do not provide legal argument and citation to authority on each point raised, "'the court may treat it as waived, and pass it without consideration'""]; *In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 227 ["'[i]ssues not supported by citation to legal authority are subject to forfeiture'"].)

Even if Live Nation's causation argument is considered, because the Dixes alleged that Live Nation's negligent conduct contributed to Katie's death (see *Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1403 ["'[t]he pleadings define the issues to be considered on a motion for summary judgment'"]), to obtain summary judgment in its favor, Live Nation was required to present evidence sufficient to negate the Dixes' contention. (Code Civ. Proc., § 437c, subd. (p)(2).) In the trial court, although Live Nation disputed the Dixes' contention that Katie would have survived the drug overdose had there been appropriate medical care readily available, Live Nation did not offer any supporting evidence. (See *Salasguevara v. Wyeth*

35

*Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 385 ["medical causation can only be determined by expert medical testimony"].)

Under these circumstances, Live Nation did not carry its initial burden to negate the causation element of the Dixes' negligence cause of action. (See *Henderson v. Equilon Enterprises, LLC* (2019) 40 Cal.App.5th 1111, 1116 ["[t]o meet its initial burden in moving for summary judgment, a defendant must present evidence that either 'conclusively negate[s] an element of the plaintiff's cause of action' or 'show[s] that the plaintiff does not possess, and cannot reasonably obtain,' evidence necessary to establish at least one element of the cause of action"]; *Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 354 ["[w]here the evidence submitted by a moving defendant does not support judgment in his favor, the court must deny the motion without looking at the opposing evidence, if any, submitted by the plaintiff"].)

In any event, the Dixes submitted an unrebutted expert opinion that "had advanced medical care been readily available," Katie "would have survived the drug ingestion." (See *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 472 ["[g]enerally, a party opposing a motion for summary judgment may use declarations by an expert to raise a triable issue of fact on an element of the case provided the requirements for admissibility are established as if the expert were testifying at trial"].)[10]

---

[10] Relying on *People v. Sanchez* (2016) 63 Cal.4th 665, Live Nation argues that the expert's opinion improperly was "based on an unsubstantiated hearsay" document. However, the trial court

36

## DISPOSITION

The judgment is reversed. The Dixes shall recover their costs on appeal.

DILLON, J.*

We concur:

PERLUSS, P. J.

SEGAL, J.

---

correctly overruled Live Nation's hearsay objection because the holding in *Sanchez* does not prohibit an expert witness from relying on hearsay. The Court in *Sanchez* held that "any expert may *still rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he [or she] did so." (*Id*. at p. 685; see Evid. Code, § 801, subd. (b) [expert opinion may be "[b]ased on matter . . . whether or not admissible . . ."].) Accordingly, the Dixes' expert witness properly relied on hearsay in forming his opinions.

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.